[No. B084276. Second Dist., Div. Seven. Nov. 30, 1994.]

ROBERT F. LEWIS et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
FOLKSAM GENERAL MUTUAL INSURANCE SOCIETY, Real Party in
Interest.

**COUNSEL**

Greines, Martin, Stein & Richland, Robin Meadow, Loeb & Loeb, Peter S. Selvin and Megan Scott-Kakures for Petitioners.

Miller, Starr & Regalia, Lawrence E. Green and Harry D. Miller as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Hughes, Hubbard & Reed, William T. Bisset and Randy B. Holman for Real Party in Interest.

**OPINION**

**WOODS (Fred), J.—**

### I.

### INTRODUCTION

This writ proceeding is taken from an order denying a motion for summary judgment and an order denying a motion for expungement of lis

pendens. The action arose out of the purchase and sale of a residence alleged to have involved a transfer in fraud of creditors.[1] The petition for a peremptory writ is granted.

## II.

### STATEMENT OF FACTS

A. *Background of the sale.*

Randolph Shipley (Shipley) bought the property in question in November 1990 for $3.2 million. About a year later, he contacted a broker, Al Scafati (Scafati), hoping to sell the property for $2,950,000. However, Scafati believed that the property would only bring somewhere around $2.5 million to $2.7 million, and after seeing the condition of the property, he lowered his estimate. Scafati found a buyer at $2.5 million, and escrow was opened at that price. However, Shipley and the buyer never reached agreement on financing.

B. *Appearance of the Lewises.*

Robert F. and Josephine N. Lewis (the Lewises) had lived in Palos Verdes for many years. They were casual house-hunters—not particularly anxious to move, but willing to consider opportunities. Chris Adlam (Adlam), like Scafati a RE/MAX realtor, called Josephine Lewis in late January 1992 to tell her about the property. Knowing that Robert Lewis had always liked the property, she told him about it, and they decided to go see it.

Adlam told the Lewises about the $2.5 million escrow and provided them with an appraisal Shipley had obtained only a month before that showed a $2.5 million value. Because the Lewises had the ability to pay cash without a financing contingency, Robert Lewis believed that Shipley would accept less than the $2.5 million asking price, and he offered $2.25 million. After an exchange of counterproposals, they agreed on $2.3 million and opened escrow in early February.

Subsequent analyses confirmed that $2.3 million was a reasonable price. For instance, shortly after the purchase, the Lewises' bank obtained its own appraisal, which concluded that the property was worth $2.3 million. An additional valuation conducted for this litigation showed that the probable range of sales prices for the property in early 1992 would have been $2.2 million to $2.6 million.

---

[1] A motion for reconsideration of the order was denied.

C. *Fontana records the federal lis pendens, but it is neither indexed by the county recorder nor discovered by the title insurer.*

After the Lewises opened escrow, and just a few days before they acquired title, Fontana Films of Sweden Aktiebalag (Fontana) recorded the federal lis pendens. Dennis McCraven (McCraven), the county recorder's division manager, document recording, determined that although the federal lis pendens was recorded on February 24, it was not indexed until February 29—the day after the Lewises acquired title.

During the same period, a title search was under way at Lincoln Title Company, which ultimately issued title insurance to the Lewises. The trial court based one of its key conclusions on its statement that Lincoln Title was "retained as Lewises['] agent." The only evidence of how Lincoln Title became involved was Robert Lewis's statement that Adlam suggested using Lincoln Title because it had been used in the previous, failed escrow. The Lewises' original offer to purchase the property only provided that the buyer was to receive a title policy issued by Lincoln Title "at sellers['] expense."

The title officer, David Pelis (Pelis), explained that title companies have access to private services that provide copies of recorded documents. In this case, the service provided Lincoln Title with a computer report that contained an entry for the federal lis pendens. However, the service misposted the information and as a result it did not appear to affect the property. Pelis himself was never aware there was a lis pendens.

D. *The Lewises acquire title and receive two "clean" title policies and never learn about the federal action.*

The purchase agreement provided that after all contingencies were removed, $350,000 could be released from escrow to Shipley in return for a note secured by a first trust deed on the property. Shipley used that money to buy other property, which Folksam General Mutual Insurance Society (Folksam) then encumbered by an injunction. This transaction occurred on February 25—the day after Fontana recorded its lis pendens—and the Lewises received a title insurance policy insuring their trust deed. Neither this policy nor the preliminary report that preceded it disclosed the federal lis pendens.

Although escrow was originally scheduled to close by April 1, Shipley asked for an earlier close, and the Lewises agreed, with the result that the Lewises' grant deed was recorded on February 28. The Lewises received a second title insurance policy, this time insuring their title as owners. Like the earlier policy, this one did not reveal any claims against title.

During this series of events, there was no substantive communication between the Lewises and Shipley; everything was handled through the realtors. Neither the Lewises nor the realtors heard anything about any litigation involving Shipley, Yuk Lee, or anyone connected with them.

E. *The Lewises undertake multimillion-dollar improvements to the property, still unaware of the Folksam-Fontana litigation.*

The all-cash purchase by the Lewises, was funded by liquidating securities holdings. They expected to spend an additional $1,050,000 in renovating the property, but that estimate turned out to be far too low. By the March 3 hearing, they had spent approximately $2.6 million on still-uncompleted construction, and they expected the total cost of the house to exceed $5 million.

In the midst of their multimillion-dollar renovation of the property, the Lewises received a copy of Fontana's cross-complaint in the mail. This was the first they ever heard about Folksam or Fontana or about any of the claims alleged in this case.

The Lewises brought a motion for summary judgment. The trial court ruled on the Lewises' motion after an unusually complete factual presentation by the parties. There was no serious claim of factual dispute and no credibility contentions. The denial of summary judgment was based entirely on legal conclusions drawn from the undisputed facts.

### III.

### Discussion

A. *The nature of the claims against the Lewises.*

Because of the Lewises' settlement with Fontana, the issues are narrower than when the trial court ruled.

The pleadings of both Folksam and Fontana, including Fontana's federal complaint, originally focused on the conduct of Shipley and related parties, alleging in substance that Shipley bought the property with misappropriated funds. There was no claim that the Lewises did anything wrong; indeed, they were not even named in either the federal action or Folksam's second amended complaint. Any claim affecting the property therefore necessarily depended entirely on the intervention of the federal lis pendens: if the lis pendens were valid—supported by a proper complaint and properly recorded

before the Lewises acquired title—in theory, the Lewises' purchase could be set aside solely upon proof of Fontana's claims against Shipley, without regard to the Lewises' conduct.

The expungement of the federal lis pendens has eliminated this possibility. (Code Civ. Proc., §§ 405.60, 405.61.)[2] What remains is Fontana's fraudulent conveyance claim against the Lewises. Since this claim is based on Shipley's transfer of the property to the Lewises rather than his original acquisition of the property, it necessarily concerns the conduct of the Lewises themselves. The Lewises contended that they had established a complete defense to this claim by virtue of Civil Code section 3439.08, subdivision (a), which provides: "A transfer or an obligation is not voidable under subdivision (a) of Section 3439.04 [transfer made with intent to hinder, delay or defraud creditors], against *a person who took in good faith and for a reasonably equivalent value . . . .*" (Italics added.)[3]

The trial court recognized that the Lewises did not actually know about the claims against Shipley or about the lis pendens: "The evidence presently before the court indicates *the Lewises had no actual knowledge of Shipley's misdeeds, nor any relationship with Shipley* other than in connection with purchase [*sic*] of 2728 Elevado. [R. Lewis Dec., par. 10]. The Lewises personally apparently had no knowledge of the federal lis pendens until September 1993 . . . ." (Italics added.)

The court concluded that the federal lis pendens deprived the Lewises of their status as good faith purchasers through constructive notice.

This conclusion is the linchpin of the trial court's denial of summary judgment and its refusal to expunge Folksam's lis pendens. Without this conclusion, summary judgment and expungement were mandatory.

B. *The fraudulent conveyance statute requires actual, subjective knowledge by the alleged fraudulent transferee. The fiction of constructive knowledge is not enough.*

■ The requirements of the fraudulent conveyance statute are: "the term 'good faith,' as used in this subdivision and subdivision (d) [of Civ. Code § 3439.08] means that the transferee did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor." (See

[2]Unless otherwise noted, all statutory references are to the Code of Civil Procedure.
[3]The trial court did not reach the question of whether the Lewises paid "reasonably equivalent value." However, as discussed above, the Lewises offered substantial evidence that they paid reasonably equivalent value, and there was no contrary evidence. The trial court remarked, "I am just almost 100 percent this was a reasonably equivalent value."

legis. committee com., 12 West's Ann. Civ. Code (1994 pocket supp.) § 3439.03, p. 161.) "Fraudulent intent," "collusion," "active participation," "fraudulent scheme"—this is the language of *deliberate wrongful conduct*. It belies any notion that one can become a fraudulent transferee by accident, or even negligently. It certainly belies the notion that guilty knowledge can be created by the fiction of constructive notice. (See *Richardson* v. *White* (1861) 18 Cal. 102, 106 [recognizing that constructive notice is a "fiction"].)

But that is nevertheless what the trial court concluded, rejecting the Legislature's clear mandate in the name of "common sense": "[C]ommon sense suggests that the test cannot be a purely subjective one which allows the transferee to preserve good faith by hiding his head in the sand and making no reasonable inquiry. The extensive case authorities cited at pages 5-6 of Folksam's reply brief confirm that 'good faith' includes doing the sort of reasonable inquiry that a reasonably prudent person would do under the circumstances." The problem with this reasoning, aside from the fact that the cited authorities do not support it, is that in the very next breath the trial court concluded that the Lewises did make what *the court itself believed was a "reasonable inquiry"*! The court said: "reasonable inquiry includes getting a title report and title insurance . . . . The Lewises themselves by their conduct evidence this to be so: they *obtained* title reports and title insurance." (Original italics.) Unfortunately, the Lewises' reasonable inquiry still left them in ignorance, because the federal lis pendens was not disclosed in the preliminary reports and title policies.

Since the Lewises had made precisely the inquiry that the trial court thought they should have made and still knew nothing about the claims against Shipley, the trial court erred in holding that they "colluded" or "actively participated" in the claimed fraudulent conveyance. Instead, the court stripped the Lewises of their good faith status by imputing to them knowledge supposedly (but not actually) held by their title insurer concerning the federal lis pendens and the supposed (but not shown by any evidence) negligence of their insurer in failing to find and disclose the lis pendens.

C. *The federal lis pendens was a nullity and did not impart notice because the claims in the federal action did not support a lis pendens.*

In ruling that the lis pendens was proper, the trial court departed from decisional authority squarely holding that claims like those asserted in the federal action—essentially, claims to impose a constructive trust—do not support a lis pendens. The trial court implicitly concluded that the 1992 revisions to the lis pendens statute (§ 405 et seq.) overruled this authority. We find no decisional support for this conclusion.

### 1. *Only a proper lis pendens can affect title.*

■ Under sections 405.2 and 405.4, subdivision (a), a lis pendens is only authorized in actions that affect "title to, or the right to possession of, specific real property."[4] Historically, the purpose of a lis pendens was to preserve the court's jurisdiction over property: if a party to litigation were able to transfer clear title during the litigation, the court would be unable to render an effective judgment. (See *Richardson* v. *White, supra,* 18 Cal. at p. 106.) The lis pendens prevents "the defendant property owner from frustrating any judgment that might eventually be entered by transferring his or her interest in the property while the action was still pending." (Cal. Lis Pendens Practice (Cont.Ed.Bar 1994) § 1.2, p. 3.)

Consistent with this limited purpose, the courts have repeatedly held that a lis pendens recorded in an action that does not involve title has no effect: ". . . if there is a failure to comply with [the lis pendens statute] there can be no constructive notice of the pendency of the action." (*Bernhard* v. *Wall* (1921) 184 Cal. 612, 630 [194 P. 1040].) As the court said in *Brownlee* v. *Vang* (1962) 206 Cal.App.2d 814 [24 Cal.Rptr. 158], the complaint must "set forth some cause of action affecting the title or right of possession of the specific real property described in the *lis pendens.* When it does not do so the *lis pendens* becomes a nullity . . . ." (*Id.,* at p. 817.) (See also *MacDermot* v. *Hayes* (1917) 175 Cal. 95, 110 [170 P. 616] [lis pendens in action to set aside sale of stock ineffective to give constructive notice]; *Allied Eastern Financial* v. *Goheen Enterprises* (1968) 265 Cal.App.2d 131, 134 [71 Cal.Rptr. 126] [lis pendens in action on loan "would have no legal effect"].)

### 2. *The claims in the federal action all involve alleged fraud and conversion, not disputes over title.*

Fontana's lengthy federal complaint boils down to this: Shipley and his coconspirators defrauded Fontana and put the money they got in various assets that Fontana seeks to reach by the imposition of a constructive trust.

The first 27 pages of the pleading recite the details of Shipley's alleged fraudulent conduct, asserting claims for the illegal sale of securities (first claim for relief) and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (second claim for relief). In these two claims, the only allegations that relate to the property appear in paragraph 12(c) (alleging the diversion of "the sums of $310,000 and $2,880,000 to defendant Yuk

---

[4] Although changes to the lis pendens statute have varied this formulation somewhat, the underlying principle has remained constant since the earliest lis pendens statute: a lis pendens is only authorized in an action affecting title or possession. (See *Richardson* v. *White, supra,* 18 Cal. 106.) The current statute requires a "real property claim," which is defined in the language quoted in the text.

Lee Limited," this sum apparently being the money ultimately used to buy the property) and paragraph 20(k) (alleging the establishment of the escrow to purchase the property).

The claims that involve the property are as follows:

Third Claim for Relief (Imposition of Trust): Fontana alleges that Shipley was acting as the plaintiffs' trustee, and further alleges: "32. As a proximate result of the foregoing, including specifically the transfer of any money and/or property to defendants and each of them, defendants and each of them hold such money and property, in trust, for the benefit of plaintiffs, with the interests of plaintiffs being superior to all other interests, in and to all such transferred property including without limitation, the following [describing the property]."

Fourth Claim for Relief (Injuctive Relief): This claim incorporates most of the preceding allegations and simply alleges that the plaintiffs will suffer harm unless the defendants are enjoined from transferring "the money and property wrongfully taken from plaintiffs."

Fifth Claim for Relief (Possession): The only substantive allegations are those incorporated by reference. Beyond that, Fontana merely alleges that "plaintiffs were and are entitled to possession, control and beneficial use of Plaintiffs' Property."

Sixth Claim for Relief (Quiet Title): Again, the substantive allegations appear by incorporation. Fontana adds the conclusionary allegation that the property described in the complaint "is property of and rightfully belonging to plaintiffs herein."

Seventh Claim for Relief (Fraudulent Conveyance): This claim does not incorporate the complaint's charging allegations. As it pertains to the property, it alleges: "44. Within the four years last past [Shipley and other defendants] made the following conveyances:

". . . . . . . . . . . . . . . . . . . . . . . . . .

"c) In October, 1990, transferred the sums of $310,000 and $2,880,000 to defendant YUK LEE LIMITED from the account of FONTANA HOLDINGS in the Cayman Islands with monies belonging to plaintiffs."

None of these claims describes any transfer of real property. None of them alleges that any of the plaintiffs had any kind of interest in the property beyond the fact that Shipley used allegedly misappropriated funds to buy it. Even the fraudulent conveyance claim does not allege a conveyance of the

property, but rather the movement of money from one Shipley pocket to another followed by the purchase of the property.

### 3. *A constructive trust claim does not support a lis pendens.*

■ As the preceding recapitulation of Fontana's claims shows, the essence of the federal complaint is the effort to impose a constructive trust on the property. It is well settled that such a claim does not permit the recording of a lis pendens.

The leading case in this district is *Urez Corp.* v. *Superior Court* (1987) 190 Cal.App.3d 1141 [235 Cal.Rptr. 837]. There the plaintiff held a second trust deed that was extinguished by the foreclosure of the first trust deed. The purchaser at the foreclosure was a corporation formed by the defaulting owner. (*Id.*, at pp. 1143-1144.) The complaint alleged causes of action for fraud in the formation of the corporation, for a declaration that the plaintiff held a beneficial interest in the property, and for the imposition of a constructive trust. (*Id.*, at p. 1144.)

This court found that the action did not support a lis pendens, noting that the case was "essentially a fraud action seeking money damages with additional allegations urged to support the equitable remedies of a constructive trust or an equitable lien." (190 Cal.App.3d at p. 1149.) The court held that "allegations of equitable remedies, even if colorable, will not support a lis pendens if, ultimately, those allegations act only as a *collateral means to collect money damages.*" (*Id.*, at p. 1149, italics added.) The *Urez* court expressly rejected the contrary reasoning of *Coppinger* v. *Superior Court* (1982) 134 Cal.App.3d 883 [185 Cal.Rptr. 24] (*Urez Corp.* v. *Superior Court, supra,* 190 Cal.App.3d at p. 1149) as have "a chorus of [other] decisions." (*Hunting World, Inc.* v. *Superior Court* (1994) 22 Cal.App.4th 67, 71 [26 Cal.Rptr.2d 923].)

### (a) *The trial court's conclusion that Folksam "owned" the property was incorrect and irrelevant.*

The trial court tried several detours around the *Urez* rule. First, it sought to distinguish *Urez* by noting that in *Urez* the plaintiff had asserted "a remote and attenuated real property claim." In contrast, according to the trial court, here there was an earlier summary judgment finding that Shipley had indeed misappropriated money from Folksam, and on this basis, the court leaped to the conclusion that this fact "establish[es] that Folksam owned a 100% beneficial interest in Elevado [the property] at the time Shipley (Yuk Lee) purported to deed the property to the Lewises. Thus Folksam was entitled to

title and possession of the property, outright." This conclusion is irrelevant: the validity of the lis pendens depends on the nature of Fontana's claims, not Folksam's.

More fundamentally, there is no apparent legal basis for the trial court's conclusion, and the court cited none. The fact that someone buys property with stolen money does not make the victim the owner of that property as a matter of real property law. It merely entitles the victim to pursue the thief and to recover a money judgment, perhaps seeking to attach the property along the way (something that no one in this case ever tried to do).

### (b) The trial court disregarded other controlling authority.

Regardless of whether *Urez* is factually distinguishable, the trial court failed to recognize that *La Paglia* v. *Superior Court* (1989) 215 Cal.App.3d 1322 [264 Cal.Rptr. 63] rejected the propriety of a lis pendens on facts virtually identical to those here. There the plaintiff claimed that the defendant was withholding royalties due plaintiff from the defendant's business operation. (*Id.*, at p. 1324.) Alleging that the defendant used the wrongfully withheld money to buy some property, the plaintiff claimed that the defendant held title to that property in constructive trust, and it recorded a lis pendens. The Fourth District held that the lis pendens was improper, observing that the plaintiff claimed "an interest in the defendant's property only to the extent the monies it alleges were wrongfully obtained have been invested therein." (*Id.*, at p. 1327.)

Exactly as in *La Paglia*, here the federal action seeks to impose a constructive trust on property purchased with money wrongfully obtained. As in *La Paglia*, Fontana claims an interest in the property "only to the extent the monies it alleges were wrongfully obtained have been invested therein." *La Paglia* is therefore directly controlling, and the trial court was required to follow it.

### (c) The 1992 revisions in the lis pendens law did not overrule Urez and La Paglia.

The trial court further sought to distinguish the *Urez* line of cases by relying on the 1992 revisions to the lis pendens law (Stats. 1992, ch. 883). Noting that the new statute made it easier to expunge a lis pendens, the court observed that the "drastically revised procedure eliminates the concerns about abuse of lis pendens which led the court in *Urez* and related cases to take a narrow view of what constitutes a 'real property claim.'" Although the trial court cited *Hunting World* in support of this conclusion, the discussion in that case was dictum. *Hunting World* involved an entirely conventional fraudulent conveyance claim, and the question before the court was

whether the *Urez* line of cases precluded the use of lis pendens in a fraudulent conveyance case in addition to constructive trust cases—in other words, the defendants were trying to narrow the lis pendens remedy even further than cases like *Urez* had already narrowed it. The *Hunting World* court declined to take that step, saying that "[e]xtension of the *Urez/Wardley* line of decisions is not warranted." (*Hunting World, Inc.* v. *Superior Court, supra,* 22 Cal.App.4th at p. 73.) The court did not even hint that it questioned *Urez.*

Neither logic nor policy supports the trial court's evident belief that the Court of Appeal should reverse field on this question. Allowing a lis pendens to be used in a constructive trust case like this transforms it into a money-collection remedy without any of the protections of the attachment statutes, a tactic for which the courts have consistently eschewed its use.

There is no reason to believe the Legislature intended to change the scope of the term "real property claim." The State Bar Report that supported the legislation disclaimed any definitional strictures: it stated that the term " 'neither includes nor excludes claims of constructive trust or equitable lien,' " and suggested leaving the area for further judicial development. (See 22 Cal.App.4th at p. 72.) In the face of this report and the *Urez* line of decisions, the fact that the Legislature made no definitional change in the statute creates a very strong presumption that it was satisfied with the restrictive interpretation given to the statute by the overwhelming majority of decisions. (E.g., *Buchwald* v. *Katz* (1972) 8 Cal.3d 493, 502 [105 Cal.Rptr. 368, 503 P.2d 1376].)

There is no getting around the fact that all Shipley did was to take money, and all the federal action seeks is to get the money back. Nothing in the case suggests the kind of real property dispute that has classically been the basis for the use of a lis pendens.

### 4. *Fraudulent conveyance claim does not support a lis pendens.*

The trial court's order does not address Fontana's fraudulent conveyance claim at all, instead focusing its entire discussion on Folksam's claim—even though only Fontana's claims in the federal action, not Folksam's claims in the present case, are relevant to the analysis of the federal lis pendens. To the extent it even mentioned Fontana's claims, the court actually seemed to reaffirm its earlier ruling that Fontana had not alleged a fraudulent conveyance: while the court said that it had changed its thinking as to the pleading of fraudulent conveyance claims since its December 20 order (where it ruled no such claim was pleaded), it only said this about Folksam—and at that, the

change in thinking seems to have been based on the erroneous belief that Folksam had named the Lewises in its second amended complaint.

In any event, while in the abstract the trial court was correct in stating that a fraudulent conveyance claim can support a lis pendens, the application of this rule in a given case depends on the specific nature of the claim. The facts of the cases the trial court relied on show why the federal action's fraudulent conveyance claims are insufficient.

*McKnight* v. *Superior Court* (1985) 170 Cal.App.3d 291 [215 Cal.Rptr. 909], presented an archetypal fraudulent conveyance. The defendant defaulted on a loan secured by real property. The plaintiff obtained a writ of attachment against the property and later obtained a judgment against the defendant. The defendant then quitclaimed his community interest in the property to his wife. The plaintiff filed a separate action to set aside this conveyance and recorded a lis pendens. (*Id.*, at pp. 295-296.) The Court of Appeal held that this second action affected title to the real property and that a lis pendens was therefore proper (although it affirmed expungement on unrelated grounds). (*Id.*, at pp. 299, 303.)

In *Hunting World, Inc.* v. *Superior Court, supra,* 22 Cal.App.4th 67, the plaintiff filed a federal trademark infringement action against one Bogar and obtained a temporary restraining order and an order to seize any counterfeit property in Bogar's possession. Soon after that, Bogar quitclaimed his interest in his residence to his wife. The plaintiff then filed a fraudulent conveyance action and recorded a lis pendens. (*Id.*, at p. 69.) As noted above, the Court of Appeal held that the lis pendens was proper.

The obvious and fundamental distinction between Fontana's federal action and cases like *McKnight* and *Hunting World* is that Fontana's complaint does not allege that there was any conveyance of real property, fraudulently or otherwise, to anyone, much less to the Lewises. It merely alleges that Shipley wrongfully took Fontana's money and used the money to buy—not convey—the property.

That Fontana labelled its claim "fraudulent conveyance" is irrelevant, because the allegations make it clear that there is no claim of a fraudulent conveyance of real property. Without such a conveyance, there can be no claim that affects "title to, or the right to possession of, *specific real property*" as required by section 405.4. (Italics added.) At bottom, Fontana merely re-alleged its constructive trust claim, which the overwhelming weight of authority holds cannot support a lis pendens.

5. *None of the remaining claims supports a lis pendens.*

The fourth, fifth and sixth claims for relief in the federal action are merely perfunctory incorporations of the securities and RICO allegations, coupled

with conclusionary allegations of entitlement to certain relief. Since none of these claims alleges anything concerning title to the property beyond the claims discussed above, they provide no additional support for a lis pendens.

■ The quiet title claim superficially seems to support a lis pendens; the trial court certainly thought so. But despite the terminology, there is no quiet title claim, for three reasons. First, as noted above, the incorporated allegations describe only a theft of money, and the other allegations do not add anything concerning title. Second, Fontana has never had standing to bring a quiet title action, because whatever interest it might have is only equitable, and the holder of equitable title cannot maintain a quiet title action against the legal owner. (*Stafford* v. *Ballinger* (1962) 199 Cal.App.2d 289, 294-295 [18 Cal.Rptr. 568].) Third, the complaint was not verified as required by the quiet title statute. (§ 761.020.)

D.　*Even if the federal lis pendens was valid, the fact that it was indexed after the Lewises took title prevented it from giving constructive notice.*

■ It is a common misperception, which the trial court evidently shared, that a recorded document imparts constructive notice from the moment it is recorded. That is not the law. The operative event is actually the indexing of the document, and that did not occur until the day after the Lewises acquired title.

The most recent in a long line of authorities stating this principle is *Hochstein* v. *Romero* (1990) 219 Cal.App.3d 447 [268 Cal.Rptr. 202]: "[B]efore the constructive notice will be conclusively presumed, the document must be 'recorded as prescribed by law.' (Civ. Code, § 1213.) A document not indexed as required by statute (see Gov. Code, §§ 27230-27265), does not impart constructive notice because it has not been recorded 'as prescribed by law.' " (*Id.* at p. 452.) The court explained the principle, citing such authorities as Witkin and Miller and Starr: " 'The policy of the law [requiring recordation and indexing] is to afford facilities for intending purchasers . . . in examining the records for the purpose of ascertaining whether there are any claims against [the land], and for this purpose it has prescribed the mode in which the recorder shall keep the records of the several instruments, and an instrument must be recorded as herein directed in order that it may be recorded as prescribed by law. If [improperly indexed], it is to be regarded the same as if not recorded at all.' [Citation.] Thus, it is not sufficient merely to record the document. 'California has an "index system of recording," and . . . *correct indexing is essential* to proper recordation. [Citations.]' [Citations.]" (Original italics.) (*Hochstein* v. *Romero, supra*, 219 Cal.App.3d at p. 452.)

The reason for this rule is obvious. The courts have long recognized that constructive notice is a "fiction" (*Richardson* v. *White, supra*, 18 Cal. at p. 106), so if a recorded document is going to affect title there must at least be a way for interested parties to find it: "The California courts have consistently reasoned that the conclusive imputation of notice of recorded documents depends upon proper indexing because *a subsequent purchaser should be charged only with notice of those documents which are locatable by a search of the proper indexes.*" (Italics added.) (*Hochstein* v. *Romero, supra* 219 Cal.App.3d at p. 452.)

In part, the trial court simply disagreed with the decision, finding "puzzling" the Court of Appeal's perceived failure to "reconcile" its holding with the language of Civil Code section 1213 stating that a document "recorded as prescribed by law from the time it is filed with the recorder for record is constructive notice."

Of course, a trial court does not have the luxury of refusing to follow decisions it disagrees with. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) But more important, the trial court's criticism was erroneous. The language that the trial court believed *Hochstein* failed to "reconcile " had in fact been interpreted by the Supreme Court in *Cady* v. *Purser* (1901) 131 Cal. 552 [63 P. 844], which *Hochstein* cited on that very point. The *Hochstein* court didn't disregard the effect of "filed with the recorder"; it knew that the question had been resolved in *Cady*. In fact, the principle was settled long before *Cady*, inasmuch as *Cady* relied in part on a case dating back almost to California's statehood. (*Cady* v. *Purser, supra*, 131 Cal. at p. 555, citing *Chamberlain* v. *Bell* (1857) 7 Cal. 292, 294.) Over the years, the courts have been absolutely consistent in following the indexing rule. (E.g., *Dougery* v. *Bettencourt* (1931) 214 Cal. 455, 462-464 [6 P.2d 499]; *Federal Construction Co.* v. *Curd* (1918) 179 Cal. 479, 487-488 [177 P. 473].)

At the hearing on the Lewises' reconsideration motion, the trial court adopted Folksam's argument that attempted to distinguish *Hochstein* and similar decisions from the present case on the basis that those cases involved documents that were improperly indexed, while the present case involves a document that ultimately was indexed properly. This is unavailing. The reason an improperly indexed document does not give notice is that no one can find it. The complete absence of indexing, even though it may be temporary, means exactly the same thing—no one can find the document. That was the state of affairs on February 28, 1992, when the Lewises acquired title. The federal lis pendens therefore did not impart notice.

E. *The trial court's finding that the Lewises acquired imputed knowledge of the federal lis pendens from Lincoln Title is both factually unsupported and directly contrary to settled law.*

■ The trial court also attempted to distinguish *Hochstein* on the ground that "[i]n *Hockstein* [*sic*], there was no evidence that the purchasers or any agent of the purchasers had *actual* notice of the title defect at the time they bought." (Original italics.) The entire predicate for this conclusion appears in just a few words in the order: ". . . Lincoln Title, the very person retained as Lewises['] agent to search title, in fact discovered the existence of the federal lis pendens on February 25, 1992, using, as it regularly does, a search system wholly independent of any indexing." Having concluded that Lincoln Title was the Lewises' agent, the trial court further concluded that the Lewises were charged with Lincoln Title's supposed knowledge of the lis pendens. There are at least three reasons why the conclusion is wrong, including direct Supreme Court authority that a title insurer's knowledge is not imputed to its insured.

1. *There was no evidence that Lincoln Title discovered the existence of the lis pendens.*

As noted above, the sum total of the evidence on this subject was that Lincoln Title's outside title service had (or knew about) the lis pendens but misposted it, so that neither Lincoln Title's title searcher nor Pelis, the title officer of the Lewises' policies, knew it was there. The most that can be said about the evidence on this subject is that there might have been a triable issue as to the state of the title searcher's knowledge. The trial court nevertheless concluded, as a matter of law (it did not specify any triable issues), that Lincoln Title knew about the lis pendens. That erroneous conclusion was the indispensable starting point for the imputation of constructive knowledge to the Lewises.

2. *There was no evidence of any agency relationship between the Lewises and Lincoln Title.*

The trial court cited no evidence to support its conclusion that Lincoln Title was the Lewises' agent, and there was none. The only evidence on the subject was the Lewises' original offer to purchase the property, which provided that a title Policy was to be issued by Lincoln Title "at sellers['] expense." There simply is no agency here.

"The essential characteristics of an agency relationship as laid out in the Restatement are as follows: (1) An agent or apparent agent holds a power to

alter the legal relations between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal has the right to control the conduct of the agent with respect to matters entrusted to him. [Citation.]" (*Alvarez* v. *Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 999 [41 Cal.Rptr. 514]; see also Civ. Code, § 2295 ["An agent is one who represents another, called the principal, in dealings with third persons."].)

There was no evidence that Lincoln Title fit within even one of these requirements, much less all three. There was no evidence that it represented the Lewises vis-à-vis anyone else; that it could alter their relationships with anyone else; that anyone believed it was a fiduciary; or that the Lewises had any right to control its conduct.

3. *Regardless of how one characterizes the relationship between the Lewises and Lincoln Title, as a matter of law, a title insurer's knowledge is not imputed to an insured.*

Another well-settled rule is that a title insurance company is not the agent of its insured, and the insurer's knowledge is not imputed to its insured. (*Mayhew* v. *Burke* (1929) 206 Cal. 396, 400 [274 P. 517].)

*Rice* v. *Taylor* (1934) 220 Cal. 629 [32 P.2d 381], is uncannily similar to this case. It involved two trust deeds executed by Taylor, the first one to Rice and the second one to a mortgage company. Rice's trust deed was improperly indexed, and the mortgage company was unaware of it when it made its loan to Taylor, but the mortgage company's title insurance company did know about it. The trial court held that Rice's trust deed was superior to the mortgage company's.

The Supreme Court reversed. Its description of the issues could have been written for the present case: "Appellant makes three basic contentions: (1) That it had no actual notice of said instruments; (2) that it had no constructive notice thereof because of the improper indexing, and (3) that it had no imputed knowledge thereof because the title company, that discovered the documents, was not its agent respecting the condition of title to the property." (220 Cal. at p. 633.) The Supreme Court agreed with all of these contentions. As to the agency claim, it observed: "The insured and the insurer deal at arm's length. There is no room for the operation of a fiduciary relationship. The title company is in business for profit. It may be willing to assume risks that the insured might think imprudent." (*Id.*, at p. 636.)

The trial court essentially misconceived Lincoln Title's role when it stated that "Lincoln's lack of reasonable diligence in acting upon the information it

discovered, is imputed to Lewises." As a matter of express statutory law, a title company issuing a preliminary report does not owe a negligence duty to a prospective insured. (Ins. Code, §§ 12340.10, 12340.11; see generally, *Southland Title Corp.* v. *Superior Court* (1991) 231 Cal.App.3d 530, 536-538 [282 Cal.Rptr. 425] [no negligence liability based on preliminary report].)[5] Lincoln Title was simply selling a product. Imputing its knowledge to the Lewises would be like imputing a car salesperson's knowledge of defective brakes to an unsuspecting buyer, and then using that imputed knowledge to subject the buyer to liability for reckless conduct for driving a car with actual knowledge that its brakes didn't work. Such a conclusion would be contrary to law, as well as to the most basic notions of fair play. It is no more appropriate here.

4. *The absence of an agency relationship between the Lewises and Lincoln Title cannot, as the trial court held, preclude a finding of good faith.*

A further component of the trial court's analysis, revealed during the hearing on the Lewises' reconsideration motion, is the notion that the Lewises are actually worse off if Lincoln Title was not their agent. According to the trial court's remarks from the bench, that conclusion would mean that the Lewises conducted no title search at all, so that, under the trial court's "duty of inquiry" standard, they would lack good faith because they failed to make a reasonable inquiry.

We are aware of no authority, and Folksam never cited any, holding that a residential homebuyer owes some sort of duty to the world at large to search title at all, much less for the purpose of avoiding fraudulent conveyance claims. More to the point, however, is that the trial court's own formulation of the supposed duty of inquiry—"getting a title report and title insurance"—exactly describes what the Lewises did.

An additional feature of this case is that on the day after Fontana recorded its lis pendens the Lewises received a trust deed and a clean title policy. It is impossible to conceive of a rationale that would impose a heightened duty of care in connection with obtaining a grant deed only several days later, but that is the effect of the trial court's ruling.

F. *The withdrawal of the lis pendens transformed the Lewises into good faith purchasers, and they are accordingly entitled to summary judgment.*

■ Although the federal lis pendens was the linchpin of the trial court's order, the court refused to recognize that the withdrawal of the lis pendens

---

[5]These principles also answer *Rice*'s suggestion, in dictum, that a "searcher of titles" could be an agent. (*Rice* v. *Taylor, supra,* 220 Cal. at p. 635.) It is clear the court was referring to an abstractor, which is not the role Lincoln Title was playing.

pursuant to the Lewises' settlement with Fontana eliminated any possible basis for Folksam's claims.

Sections 405.60 and 405.61 govern the effect of a lis pendens that has been withdrawn. Section 405.60 provides: "Upon the withdrawal of a notice of pendency of action . . . *neither the notice nor any information derived from it, . . . shall constitute actual or constructive notice* of any of the matters contained, claimed, alleged, or contended therein, or of any of the matters related to the action, or create a duty of inquiry in any person thereafter dealing with the affected property." (Italics added.)

Section 405.61 provides that upon the withdrawal or expungement of a lis pendens, even a person with actual knowledge of a claim is not bound by it. The statute provides that no one who acquires an interest in the property "shall be deemed to have actual knowledge of the action or any of the matters contained, claimed, or alleged therein, or of any of the matters related to the action, *irrespective of whether that person possessed actual knowledge of the action or matter and irrespective of when or how the knowledge was obtained.*" (Italics added.)

The statute contains an unusually strong statement of Legislative intent that emphasizes the statute's broad reach: "It is the intent of the Legislature that this section shall provide for the *absolute and complete free transferability of real property* after the expungement or withdrawal of a notice of pendency of action." (§ 405.61, italics added.)

These statutory provisions make clear that once a lis pendens is withdrawn or expunged, title to the property must be treated as though the lis pendens had never been filed.

The few courts that have interpreted these statutes and their almost identical predecessors have all recognized this goal. (E.g., *Knapp Development & Design* v. *Pal-Mal Properties, Ltd.* (1987) 195 Cal.App.3d 786, 790 [240 Cal.Rptr. 920] [any notice "is entirely eliminated"]; *Ranchito Ownership Co.* v. *Superior Court* (1982) 130 Cal.App.3d 764, 770 [182 Cal.Rptr. 54] [record owner can "deal with his property as though no notice of lis pendens has been filed"].)

While it is true that the expungement statute speaks in terms of persons dealing with the property after the withdrawal of the lis pendens, here that description applies to anyone who acquires title from the Lewises—in other words, the Lewises may now transfer their property as though the lis pendens never existed. This result functionally makes the Lewises bona fide purchasers retroactively, since otherwise they could not transfer clear title.

The only fact that could possibly change this result is the pendency of Folksam's claims and Folksam's lis pendens. But under the trial court's ruling, the only basis for Folksam's claims is the federal lis pendens, which supports Folksam's claims only because it gave the Lewises constructive or imputed notice. Since the Lewises' liability is based entirely on a fiction, when the fiction goes away so should the liability.

G. *The Lewises paid equivalent value.*

At oral argument on September 8, 1994, counsel were given leave to file supplemental letter briefs pertaining to the applicability of payment of equivalent value by the Lewises.

Relying on the case of *Davis* v. *Ward* (1895) 109 Cal. 186 [41 P. 1010], Folksam contends that even if the Lewises took title before the indexing of the Fontana lis pendens, they nevertheless were not bona fide purchasers because they did not fully pay for the property until after indexing. Folksam appears to be making a make-weight argument that if the court determines that the date of recordation is not the effective date by reason of an absence of indexing until later, then the date for determining the Lewises' status is the date they paid $1,950,000 as the balance of the purchase price on the property. By then, Folksam contends, the deed had long since been indexed and the Lewises were chargeable with notice of the lis pendens. We have previously determined that the Lewises are entitled to a peremptory writ on three separate grounds, namely, that constructive notice was insufficient to defeat the Lewises' status as purchasers in good faith, that the Fontana federal action did not support a lis pendens, and that the withdrawal of the lis pendens nullified its effect.

Nevertheless, we address Folksam's make-weight argument and conclude that the *Davis* case payment of value rule does not apply in the instant case for a number of reasons, more fully explained hereafter, including these: (1) the rule does not apply and should not be applied at all to fraudulent transfer actions; (2) the rule is inconsistent with modern conveyancing practice and law; (3) the rule does not apply to purchasers who do not have *actual* notice of a competing claim to property; (4) the way in which the *Davis* court adjusted the equities of the parties does not apply in this instance; (5) the rule should only be applied in favor of a party that itself is a bona fide purchaser or has encumbrancer status, which Folksam did not; and (6) *Davis* cannot be applied here without violating the very equitable principles that undergird the decision.

1. *Davis does not apply to fraudulent transfer actions.*

The payment of value rule defined in *Davis* is one small part of an extensive body of real property recording and notice rules. These rules

govern conflicts concerning ownership of or encumbrances against property. Never have they been extended to, much less adopted wholesale by, the separate body of law governing fraudulent conveyances.

The recording and notice rules governing real property conveyances were designed to establish a system of priorities among claimants asserting competing interests in property. In this system, a bona fide purchaser who first duly records his deed is granted preference over all unrecorded and unknown interests. (3 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 8.3, p. 273.) The system operates without regard to fault, in the sense that a completely innocent purchaser who fails to record his deed becomes junior to anyone else who records a deed without knowing of the innocent purchaser's interest.

The fraudulent transfer statutes serve a completely different and unrelated purpose: they were designed not to ensure predictability in the priority of titles, but for *the protection of creditors.* (See legis. committee com., 12 West's Ann. Civ. Code, *supra,* § 3439.03, p. 150 [fraudulent transfer statute intended "to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors"].) These statutory provisions allow creditors to set aside a transfer made with "actual intent to hinder, delay or defraud any creditor." (Civ. Code, § 3439.04, subd. (a).) In such an action, the central inquiry is whether the transfer was fraudulently made. Issues of notice, recording and payment of value, which are fundamental to real property conveyance disputes, are relevant insofar as they may tend to prove or disprove fraudulent intent. The reason is that creditors are not entitled to protection against the world at large, but only against fraudulent conduct.

In deciding whether fraudulent intent has been proven, courts must look only to rules concerning fraudulent transfers, and should not be distracted by similar-sounding terms used in real property recording statutes. " ' "[T]here is no rule of law that necessarily requires the same meaning to be given to the same word used in different places in the same statute" . . . much less the same word used in different statutes relating to essentially different matters and subject to different construction.' [Citation.]" (*Botello* v. *Shell Oil Co.* (1991) 229 Cal.App.3d 1130, 1137 [280 Cal.Rptr. 535].) In the present case, superficial linguistic similarities between the two bodies of law mask fundamental distinctions that preclude the indiscriminate application in one area of principles developed in the other.

The recording statutes concern what are generally called "bona fide purchasers"; the fraudulent transfer law provides a defense to one who "took in good faith and for a reasonably equivalent value." (Civ. Code, § 3439.08,

subd. (a).) While the language of these two areas of law is roughly comparable, the legal significance is decidedly different. In a real property conveyance dispute, a bona fide purchaser must pay value for the property, but there is no particular requirement as to how much he must pay: he may prevail over another grantee even though he has paid far less than the property is worth. As the Supreme Court observed in *Horton* v. *Kyburz* (1959) 53 Cal.2d 59 [346 P.2d 399]: " 'The inadequacy of price is a circumstance proper to be considered in determining the question of good faith, but it will not the less fall within the legal definition of valuable consideration, *however disproportionate it may be to the value of the land.*' [Citation.]" (Italics added.) (*Id.*, at pp. 65-66; see also *Odone* v. *Marzocchi* (1949) 34 Cal.2d 431, 436 [211 P.2d 297, 17 A.L.R.2d 1109] [adequacy of consideration is not essential to the validity of a deed].) Under *Davis*, however, the timing of the payment may be significant.

In contrast, the fraudulent transfer statutes work exactly the opposite way. Because a fraudulent transfer action focuses on protection of creditors—persons not parties to the property transaction—the transferee must pay reasonably equivalent value in order to establish a defense. However, the timing of actual payment is irrelevant, since the concept of value necessarily includes debt as well as cash payment.

In sum, we find Folksam's position to be confused. Although it brought this action under the fraudulent transfer statute, it is attempting to prove its theory not by meeting the statutory definition of fraud, but by applying a set of property conveyance rules that, as far as we are aware, no court has ever applied to fraudulent conveyances. Having chosen to ground its claim in fraudulent transfer law, Folksam is precluded from picking and choosing from other unrelated bodies of law to bolster its position.

2. *The payment of value rule should not govern Folksam's claim against the Lewises and their property.*

In *Davis*, Ward mortgaged some property to Davis' predecessor. Apparently by mutual mistake, the mortgage identified the wrong parcel of land. Ward later sold half of the property to Fleming, who paid cash, and half to Brown, who paid part cash and part notes. (*Davis* v. *Ward, supra,* 109 Cal. at pp. 187-191.) Davis sued to have the mortgage reformed and foreclosed. Evidence at trial proved that Fleming and Brown both took without notice of the prior sale because the mortgage was recorded against the wrong property and could not have been discovered by searching the record of the property actually purchased. The evidence also showed, however, that when

Brown received notice of Davis' claim—apparently by being sued—he had paid only $200 of the purchase price. (*Id.*, at p. 190.) Fleming and Brown both won nonsuits on the ground that they were bona fide purchasers.

On appeal, the Supreme Court affirmed the nonsuit as to Fleming, the cash purchaser. However, it reversed Brown's nonsuit, holding that he was not a bona fide purchaser because he could not show that "the purchase money had been paid before notice." (109 Cal. at p. 189.) The court relied in part on *Jewett* v. *Palmer* (1823 N.Y. Ch.) 7 Johnson's Chancery Reports 65, where the court explained, " 'A plea of a purchase for a valuable consideration, without notice, must be with the money actually paid; or else, according to Lord Hardwicke, you are not hurt. The averment must be, not only that the purchaser had not notice at or before the execution of the deeds, but that the purchase money was paid before notice.' " (*Davis* v. *Ward, supra,* 109 Cal. at p. 190, italics omitted.)

As we discuss in more detail below, the Supreme Court did not decide what remedy should be applied. It simply reversed a nonsuit, saying nothing about how the trial court should adjust the parties' rights.

Folksam maintains that the facts in *Davis* parallel those involved here, and it asks this court to apply the payment of value rule to defeat the Lewises' good faith defense. A careful dissection of *Davis*'s logic and aims, however, reveals how Folksam's argument fundamentally distorts the case's meaning and the payment of value rule. Properly understood, *Davis* should not extend to the Lewises and, in any event, does not support the implication that Folksam should be permitted to use the property to recover funds allegedly stolen by Shipley.

 (a) *The payment of value rule stated in Davis cannot be reconciled with modern real property law and practice and should be strictly limited to its facts.*

*Davis* was premised, in part, on Lord Hardwicke's assertion that a purchaser who loses his property is "not hurt" if he has not fully paid for the land. This claim is inconsistent with both equitable considerations and modern market expectations.

Any purchaser without notice who makes a down payment and unequivocally obligates himself to pay the balance has every reason to believe that, if he makes the payments when due, his right to the property will be secure. Such a purchaser may drastically alter his position on the basis of this understanding, such as by selling his prior residence, moving his family and making significant improvements to the property. If his property is taken, his

injury remains even if his money is returned. Aside from ignoring this undeniable reality, *Davis* also ignores the ancient principle that real property is unique and its loss cannot be compensated in money. (*Glynn* v. *Marquette* (1984) 152 Cal.App.3d 277, 280 [199 Cal.Rptr. 306] [specific performance available in land sale contracts because it is assumed real property is unique]; see Civ. Code, § 3387 [presumption that breach of agreement to transfer property cannot be adequately compensated].) We discern that Lord Hardwicke was simply expostulating an erroneous rule of law.

While this court is bound to follow existing Supreme Court authority, we resist any attempt to apply an outdated theory to modern real property transactions. Since *Davis* was grounded on an archaic and misunderstood principle of real property conveyancing, we confine it to its facts and its narrow purpose. We decline to extend *Davis* beyond the boundaries of conveyancing law to a fraudulent conveyance action.

It should also be observed that Folksam's reliance on *Davis* appears contradictory. Until Folksam filed its answer to California Land Title Association's amicus curiae brief, Folksam had steadfastly relied on standard recording and notice rules in an effort to undermine the Lewises' bona fide purchaser status. However, now it urges this court to expand *Davis* to reach a result that is inconsistent with these same rules.

Notice and recording rules work precisely because they lead to predictable results. *Davis* carves out a narrow exception to respond to particular equitable concerns—a narrow exception that contradicts what would be expected from a more typical application of notice and recording rules. For example, if, in *Davis*, Brown had recorded his deed, Brown should prevail over Davis using a straightforward race/notice analysis because he took without notice of Davis's claim, gave value (in the form of a note), and duly recorded his deed. However, the payment of value rule leads to the opposite result: Brown loses his bona fide purchaser status, despite having done everything a bona fide purchaser is supposed to do. Kept within its original boundaries, *Davis* may serve equitable purposes without undermining the everyday operation of real property conveyancing. But to wrench the case out of its special context is to risk upsetting the very predictability that real property rules were designed to insure.

(b) *Davis cannot rationally be applied to cases involving only constructive notice.*

 In *Davis*, Brown received actual notice of the litigation affecting his property; there was no constructive notice, and the court did not opine on

what the effect of constructive notice would have been. The same is true in the only other case Folksam cites that actually applies *Davis* to a partial payment situation, *Title Guarantee & Trust Co.* v. *Henry* (1929) 208 Cal. 185, 192 [280 P. 959].[6]

One might argue that a buyer in this situation—someone who continues to pay his seller in the face of actual notice of a competing claim—should be at risk of losing his post-notice investment, if only because the assertion of the claim could give rise to a defense to the payment obligation (in other words, the buyer becomes a volunteer). But constructive notice should not have that effect, and nothing in *Davis* requires such a result.

Applying *Davis* to a case of constructive notice penalizes a completely innocent purchaser for simply living up to his payment obligations. This is a purchaser who is "innocent" in every sense of the recording statutes, because he has already acquired title and has already received whatever title information or title insurance he was entitled to under his purchase agreement. If constructive notice before payment threatens him with loss of title, he will have to undertake a title search before each and every payment—360 title searches for a typical 30-year note! Such an obviously absurd result is fundamentally contrary to the whole purpose of the recording statutes, but it would be the unavoidable result of holding that constructive notice is enough to trigger the *Davis* payment of value rule.

(c) *Davis does not apply because the fraudulent transfer act requires only the payment of "reasonably equivalent value," not full payment in cash.*

Under the indexing rule, the Lewises could not be charged with constructive knowledge of Fontana's lis pendens until February 29, 1992. By that time, they had paid "value" in two ways. First, $350,000 of their money was released from escrow on February 25, 1992. Then, on February 28, the day before the lis pendens was indexed, the Lewises' grant deed was recorded. As of that moment they were, under their purchase agreement, legally obligated to pay the balance of the purchase price, and without further documentation, the property was subject to a vendor's lien to secure payment of that amount. (Civ. Code, § 3046.) That outstanding obligation, combined with the $350,000 already paid, represented the "reasonably

---

[6]*Henry* bears no factual resemblance to the present case; it involved a defendant who claimed an interest under a contract that had never been properly delivered. The other cases Folksam relies on quote the payment of value rule in circumstances where there was not, in fact, any issue of partial payment. (*Kenniff* v. *Caulfield* (1903) 140 Cal. 34, 45 [73 P. 803]; *Eversdon* v. *Mayhew* (1884) 65 Cal. 163, 167 [3 P. 641]; *County Bank of San Luis Obispo* v. *Fox* (1897) 119 Cal. 61, 64 [51 P. 11].)

equivalent value" of the property. Accordingly, as of February 28, the requirements of the Lewises' good faith defense had been fulfilled.

Although *Davis* holds that giving a note instead of actual payment is insufficient, that was not a fraudulent conveyance action. This case is, and it has to be governed by fraudulent conveyance principles.

 (d) *Davis permits an injured party to assert an interest in disputed property only during the time the wrongdoing seller retains an interest in the property by virtue of the purchase money note.*

To understand *Davis*, one must move beyond a superficial reading of the opinion and understand what was really going on.

The language of the decision focuses on Brown's status as a bona fide purchaser. However, it is *Ward*'s conduct, not Brown's status, that explains the result. Ward was the only wrongdoer in *Davis*: he improperly attempted to convey unencumbered title to Fleming and Brown despite a preexisting mortgage, which left him with a continuing interest in the property in the form of a claim against Brown for the balance of his purchase price, secured at least by a vendor's lien (Civ. Code, § 3046), if not an express mortgage. If anyone should have lost his interest in the property to compensate an injured party, it was Ward.

Because the court in *Davis* merely reversed Brown's nonsuit and re-manded the case, it did not determine the proper remedy. However, the trial court, exercising its equitable powers, could have easily preserved all of the parties' interests in the property except Ward's, in recognition that Ward, as the wrongdoer, should be the one to sacrifice his interest—i.e., his claim against Brown for the balance of his purchase price. The likely and appropriate remedy would have been for Davis to acquire Ward's interest in the property. In other words, Davis would become the payee of Brown's note to Ward, and Brown's position would remain unchanged: he would continue to pay the note, but would make payments to Davis rather than Ward, whose interest would be extinguished. Under this approach, the wrongdoer is penalized, the aggrieved party is compensated and the innocent purchaser's rights are preserved. This result would be possible because, at least as far as the opinion reveals, by the time of trial Brown's note to Ward was still outstanding, so the trial court had something on which to act.

*Davis* reaches (or at least permits) this correct result, but for the wrong reasons. Davis should have prevailed not because Brown was not a good faith purchaser, but rather because Ward continued to hold an interest that, in

equity, belonged to Davis, as the party damaged by Ward's wrongful conduct. Viewed this way, *Davis* serves a particularized goal: a party injured by a seller's transfer of title may succeed to any interest the seller retains in the property, so long as that interest has not been extinguished before the claim is asserted.

This goal is not served by extending *Davis* to the present case. The Lewises fully paid the note and extinguished Shipley's interest by the end of March 1992, but Folksam did not bring this action until May 1992, and the Lewises were not served until September 1993. Folksam may well have a legitimate claim against Shipley. But it cannot attempt to satisfy this claim by proceeding against Shipley's former property, because the Lewises now own that property outright. Unlike the situation in *Davis*, it is too late to adjust the parties equities, because the wrongful seller's interest in the property has been extinguished.

(e) *Davis should not be applied in favor of a claimant that is not itself a bona fide purchaser or encumbrancer.*

The most striking difference between this case and *Davis* is in the nature of the competing parties' claims to the property. In *Davis*, all three claimants had actual title claims—Davis as a mortgagee, and Brown and Fleming as fee holders—and they were all innocent even of constructive knowledge at the time they acquired title. The court had to resort to the payment of value rule as a way of adjusting the equities among parties whose title was, in all other respects, of equal stature.

Here, the Lewises acquired a fee interest, but Folksam's only interest is a lis pendens filed by someone else—a document that, at the very most, simply established that Fontana has an as-yet-unproven claim against the property. A party in Fontana's position should not be entitled to bona fide purchaser/encumbrancer status, and *Davis* should not be applied to such claimants. A fortiori, Folksam's rights should be no greater.

This conclusion finds support in cases examining the rights of judgment lien creditors. For example, in *Fulkerson* v. *Stiles* (1909) 156 Cal. 703, 705 [105 P. 966], the court observed that "[a] judgment plaintiff has a mere general lien upon the real property of the judgment defendant. Such lien is an encumbrance, but the original judgment plaintiff is not ordinarily an encumbrancer for a valuable consideration." (Accord, *Hansen* v. *G & G Trucking Co.* (1965) 236 Cal.App.2d 481, 496 [46 Cal.Rptr. 186] ["a mere judgment creditor is not entitled to protection as a bona fide purchaser for value"].) If a judgment lien creditor, who has already prevailed in an action

against the defendant and already has an enforceable lien, is not entitled to bona fide purchaser status, it has to follow that a lis pendens holder—whose claim has not even been adjudicated—cannot have a stronger position.

If, as appears from *Davis*, the payment of value rule is used to adjust equities between parties that would otherwise be bona fide purchasers, then Folksam should not be able to gain any advantage from the rule.

 (f) *Davis should not be applied where its use would subvert the very same equitable principles that informed its result.*

In *Henry* v. *Phillips* (1912) 163 Cal. 135, 141 [124 P. 837], the Supreme Court cited *Davis*'s payment of value rule and declared that "[t]he rule is not absolute or invariable, but depends upon circumstances and is *governed by principles of equity and justice*." (Italics added.) The court further explained: "where a very small part of the price was unpaid when notice was received, or where the defrauded party was negligent to the prejudice of the purchaser, or where, from the fact of improvements made in good faith, or other conditions, it would be a great hardship upon the vendee to take the land from him, it is said that he should be allowed to retain the land and the defrauded party limited to the recovery of the part of the purchase money still owing by such vendee." (*Ibid.*; see also 3 Miller & Starr, Cal. Real Estate, *supra*, § 8:41, p. 349.)

 (i) *Because the Lewises fully paid their note and made substantial improvements, they are entitled to keep the property.*

If the payment of the value rule is applied here, the Lewises should retain the property and Folksam should be limited to money damages (in this case recoverable, if at all, from Shipley, the culpable party). By the time the Lewises received notice of the pending litigation (when they were served with Fontana's cross-complaint, 19 months after they purchased the property), they had fully paid the purchase price and had invested another $2.6 million renovating the property. As the court recognized in *Henry* v. *Phillips*, *supra*, where little of the purchase price remains unpaid, or where substantial improvements have been made prior to notice, equity demands the vendee retain the land and the defrauded party be limited to money damages. This case involves not one, but both, of these factors. It would be patently unfair, and would undermine the equitable foundation of *Davis*, to allow the payment of value rule to deprive the Lewises of their home.

 (ii) *Applying Davis would unfairly penalize the Lewises for paying cash for the property, rather than financing the purchase price.*

In *Davis*, the court recognized that if Ward had assigned the notes to a bank for value and without notice, "the defense of both Brown and the bank

to this action would be complete, for in that event, the notes would have been payment." (*Davis* v. *Ward*, *supra*, 109 Cal. at p. 191.) In other words, the fact that the seller ends up being fully paid transforms the buyer into a good faith purchaser when otherwise he would not be. This distinction makes no sense; from the buyer's perspective, he is in the same position, and equally obligated to repay a note over time, whether the seller or a bank holds the mortgage.

Here, the Lewises did not merely obligate themselves to pay the purchase price; they paid the price in cash before receiving notice of the litigation. Bringing this case within *Davis*'s sweep would lead to a thoroughly anomalous result: the Lewises, cash buyers, would be at risk of losing their property, while another purchaser, who paid only a small down payment and financed the balance, would be considered a bona fide purchaser. No one could comfortably acquiesce in so unfair an outcome.

## IV.

### DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to vacate its order denying petitioners' motion for summary judgment, and thereafter issue a new and different order granting said motion and expunging the lis pendens. Petitioners to recover costs of these proceedings.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied December 29, 1994, and the petition of real party in interest for review by the Supreme Court was denied March 16, 1995. Kennard, J., was of the opinion that the petition should be granted.