[No. B131248. Second Dist., Div. Four. Oct. 21, 1999.]

BGJ ASSOCIATES, LLC, et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES, Respondent;
M2B2, LLC, Real Party in Interest.

**COUNSEL**

Greg David Derin; Greines, Martin, Stein & Richland, Robin Meadow and Dana F. Gardner for Petitioners.

No appearance for Respondent.

Hillel Chodos and Deborah Chodos for Real Party in Interest.

OPINION

VOGEL (C. S.), P. J.—

INTRODUCTION

The plaintiffs brought an action which included allegations supporting a constructive trust on a parcel of real property, and recorded a notice of pendency of action (lis pendens). (Code Civ. Proc., § 405 et seq.)[1] On the defendants' motion the trial court expunged the lis pendens notice pursuant to section 405.31 on the ground that plaintiffs' pleading does not contain a "real property claim" within the meaning of the lis pendens statute. The plaintiffs have petitioned this court for a writ of mandate to compel the trial court to vacate its expungement of the lis pendens notice. Review by extraordinary writ is expressly provided in section 405.39. We issued an order to show cause to address an issue of continuing interest: the circumstances under which an allegation supporting a constructive trust will support a lis pendens.

We conclude the trial court properly expunged the lis pendens. For purposes of the lis pendens statute, this action, against partners/joint venturers, and a third party, for usurping to themselves the partnership's/joint venture's opportunity to purchase the disputed property, should be interpreted as primarily for money damages even though it also includes a request to impose a constructive trust on the property. In light of the clear policy of the courts to narrowly interpret the lis pendens statute in constructive trust cases in order to prevent its possible abuse to coerce settlement, plaintiffs are not entitled to maintain a lis pendens.

PRELIMINARY PROCEDURAL AND LEGAL BACKGROUND

The lis pendens statute was revised in 1992. The Real Property Law Section of the State Bar of California proposed the revision and submitted a report to the Legislature. The comments in the State Bar report were relied upon by the Legislature and indicate the legislative intent. (*Hunting World, Inc.* v. *Superior Court* (1994) 22 Cal.App.4th 67, 71-72 [26 Cal.Rptr.2d 923]; *Lewis* v. *Superior Court* (1994) 30 Cal.App.4th 1850, 1864 [37

---

[1]All further statutory references are to the Code of Civil Procedure.

Cal.Rptr.2d 63]; Historical Note, 14 West's Ann. Code Civ. Proc. (1999 supp.) § 405, p. 149; see *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700 [170 Cal.Rptr. 817, 621 P.2d 856].) These comments (hereafter cited as Comment) are reproduced under the applicable sections in both Deering's and West's Annotated California Codes. (14 West's Ann. Code Civ. Proc. (1999 supp.) § 405.1 et seq., p. 150 et seq.; Deering's Ann. Code Civ. Proc. (1999 supp.) § 405.1 et seq., p. 62 et seq.)

The 1992 legislative revision, however, took no position and left to future judicial development the precise issue involved here, the circumstances under which a pleading supporting a constructive trust as to real property constitutes a "real property claim" so as to justify a lis pendens. "Current law is in conflict regarding the availability of the lis pendens procedure in cases claiming a constructive trust or equitable lien. [Citations.] The definition of 'real property claim' neither includes nor excludes claims of constructive trust or equitable lien. Instead, the law in this area is left for judicial development." (Comment to § 405.4.)

Section 405.4 provides, " 'Real property claim' means the cause or causes of action in a pleading which would, if meritorious, affect (a) title to, or the right to possession of, specific real property . . . ." This section "defines the type of claim which must be pleaded to support a lis pendens. If the pleading filed by the claimant does not properly plead a real property claim, the lis pendens must be expunged upon motion under CCP 405.31." (Comment to § 405.4.)

Section 405.31 provides, "In proceedings under this chapter, the court shall order the notice expunged if the court finds that the pleading on which the notice is based does not contain a real property claim." This section "concerns pleading. Prior law became confused because of failure of the courts to distinguish between allegations (pleadings) and evidence. This section concerns judicial examination of allegations only. Judicial examination of factual evidence is separately governed by CCP 405.32. [¶] . . . The analysis required by this section is analogous to, but more limited than, the analysis undertaken by a court on a demurrer. Rather than analyzing whether the pleading states any claim at all, as on a general demurrer, the court must undertake the more limited analysis of whether the pleading states a real property claim." (Comment to § 405.31.)

In contrast to such demurrer-like review of whether the "pleading" states "a real property claim," section 405.32 provides an entirely separate ground of attack in the trial court on a lis pendens notice, an *evidentiary* hearing on

the *probability* the proponent will be able to *establish* a *valid* real property claim. It provides, "In proceedings under this chapter, the court shall order that the notice be expunged if the court finds that the claimant has not established by a preponderance of the evidence the probable validity of the real property claim." This section "expressly concerns factual merit. Provision for a demurrer-like review of the pleading is preserved in CCP 405.31." (Comment to § 405.32.)

The present case involves only the demurrer-like review pursuant to section 405.31 of whether the pleading states a "real property claim." (§§ 405.4, 405.31.) In the trial court, the defendants' motion to expunge the lis pendens notice was based solely on the pleading pursuant to section 405.31. The defendants expressly disclaimed an evidentiary hearing on the probable validity of the real property claim pursuant to section 405.32. The parties' moving and opposing papers addressed only the pleading. The trial court granted the defendants' motion to expunge the lis pendens notice, on the ground that the "[c]omplaint does not involve a real property claim." The plaintiffs promptly filed the present writ petition to review that order. After receiving a preliminary opposition from the real party in interest, we issued an order to show cause to review that order.

The formal opposition subsequently filed by the real party attempts to inject new evidentiary matter into this writ proceeding. It contends that, "after the hearing on the motion to expunge, discovery has shown that all of the claims on which the lis pendens is based are totally fictitious and without any substantive merit as a matter of law." (Italics omitted.) It offers to this court over 450 pages of "exhibits" in opposition to the petition, consisting of papers and evidentiary exhibits in support of a motion for summary judgment in the trial court. Seven pages of its formal opposition in this court are devoted to an argument that, "[o]n the merits, the undisputed evidence establishes that plaintiffs are unable to prove their claims . . . as a matter of law; therefore, the lis pendens was properly expunged."

In their reply in this court, the plaintiffs object to consideration of the real party's evidentiary material. They point out that the ruling under review was based solely on the pleading, and that the trial court did not consider the evidentiary matter cited by the real party, it having been produced after the ruling under review.[2]

■ We agree with plaintiffs, and shall not consider any evidentiary matter. This proceeding involves a demurrer-like review of the trial court's ruling which was based solely on the pleading pursuant to section 405.31.

[2]The trial court subsequently denied the real party's motion for summary judgment.

Evidence extrinsic to the pleading cannot be considered on demurrer. (*Executive Landscape Corp.* v. *San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 499 [193 Cal.Rptr. 377]; *Bach* v. *McNelis* (1989) 207 Cal.App.3d 852, 864 [255 Cal.Rptr. 232]; Comment to § 405.30 ["A motion to expunge under CCP 405.31 . . . involves only a review of the adequacy of the pleading and normally should not involve evidence from either side"]; Cal. Lis Pendens Practice (Cont.Ed.Bar 1997) § 3.14, p. 105.) Ordinarily a reviewing court will not consider evidence arising after the trial court ruling, involving facts open to controversy which were not placed in issue or resolved by the trial court. (*Crouse* v. *Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1526-1527, fn. 3 [80 Cal.Rptr.2d 94]; see Cal. Rules of Court, rule 56(c) [record on a petition for a writ of mandate involves documents submitted to the trial court supporting and opposing the ruling under review].)

## FACTS

The pertinent facts, therefore, are those alleged in the complaint, which are assumed to be true for the purpose of the demurrer-like ruling under section 405.31. (Comment to § 405.31; *Deane* v. *Superior Court* (1985) 164 Cal.App.3d 292, 294, fn. 1 [210 Cal.Rptr. 406].)

### *Plaintiffs.*

There are three named plaintiffs: Robert Goldman (Goldman); Jerome Janger (Janger); and BGJ Associates, LLC, a Delaware limited liability company (BGJ), formed by Goldman, Janger, and *defendant* Maynard Brittan (Brittan).

### *Defendants.*

There are three named defendants: M2B2, LLC, a Delaware limited liability company (M2B2), formed by the officers of Budget Rent a Car of Southern California; Brittan; and Jeff Wilson (Wilson).

### *Summary*

The basic theory of plaintiffs' action is that Brittan, Goldman, and Janger formed BGJ as a joint venture to buy certain real properties jointly with M2B2, but that Brittan and M2B2, in breach of their fiduciary duties, together with Wilson, wrongfully acquired the properties for themselves, to the exclusion of plaintiffs. Plaintiffs assert multiple causes of action for breach of oral contract, breach of fiduciary duty, unjust enrichment, intentional and negligent interference with contractual relations, inducing breach

of contract, and imposition of constructive trust. As to most of these causes of action, plaintiffs allege that defendants acquired the properties as constructive and involuntary trustees for plaintiffs, and plaintiffs' prayer for relief requests compensatory and punitive damages and/or orders compelling defendants to convey to BGJ and/or Goldman and Janger an interest in a described portion of the properties and possession thereof.

*Detailed Allegations*

The dispute concerns two parcels of real property which had been included among four parcels in a railroad right-of-way running along Santa Monica Boulevard in the City of Beverly Hills. The properties were owned by Southern Pacific Transportation Company, whose successor in interest was Union Pacific Railroad. "Parcel 1" and "Parcel 2" are west and east of the intersection of Santa Monica and Wilshire Boulevards.

Wilson owns real property adjacent to Parcel 1. Brittan owns real property adjacent to portions of Parcel 1, and he had filed a lawsuit against the railroad asserting a prescriptive easement over a portion of Parcel 1. Janger was Brittan's attorney in the lawsuit against the railroad.

In 1995 and 1996 Goldman was engaged in negotiations to purchase all four parcels from the railroad. Goldman discussed with Wilson a possible joint venture to develop the easterly portion of Parcel 1 in conjunction with the Wilson property adjacent to Parcel 1, and Wilson expressed interest in such a venture. Goldman and the railroad reached agreement and opened an escrow, but the escrow failed to close due to the railroad's inability to deliver the agreed title.

In 1997 Brittan discussed with the railroad the possibility of settling his lawsuit by acquiring title to the portion of Parcel 1 over which he asserted an easement. The railroad was unwilling to sell only the portion of Parcel 1 in which Brittan was interested, but indicated it might be willing to sell to Brittan all of Parcels 1 and 2.

Brittan's attorney, Janger, was aware of Goldman's prior efforts to purchase all four parcels, which included Parcels 1 and 2. At Janger's suggestion, Brittan, Goldman, and Janger met in August 1997 to discuss a possible joint effort by Brittan and Goldman to purchase Parcels 1 and 2. Goldman told Brittan about a potential joint venture with Wilson. Goldman and Brittan agreed to explore the possibility of acquisition of Parcels 1 and 2 by Brittan and/or a group of which Brittan was a member. Janger opened negotiations with the railroad.

The railroad disclosed that it was also negotiating with other parties to sell Parcels 1 and 2. These included Wilson and Budget Rent a Car (Budget). Budget was interested in Parcel 2, which was adjacent to its existing car rental property.

With the consent of Brittan, Goldman called Wilson to see if Wilson was interested in joining with Brittan and Goldman to acquire Parcels 1 and 2. Wilson said he and Budget were already prepared to make a joint offer to purchase Parcels 1 and 2. But Wilson suggested that Wilson and Goldman meet with Budget to explore a possible joint effort with Budget. Wilson later indicated a disinterest in pursuing the purchase from the railroad until the railroad accomplished a "swap" of certain interests with the Beverly Hills Land Company which would enable the railroad to convey a 98.2 percent interest in Parcels 1 and 2.

About December 1, 1997, Brittan, Goldman, and Janger agreed that Janger should join the Brittan/Goldman group as a principal, and that Brittan, Goldman, and Janger would each be one-third participants in a joint effort to acquire Parcel 1 from the railroad.

By December 16, 1997, Goldman had successfully negotiated the terms of an agreement with Budget by which Brittan, Goldman, Janger, and Budget would jointly offer to purchase Parcels 1 and 2, with the understanding that Budget would acquire Parcel 2, paying a substantially higher price per square foot than the price attributable to Parcel 1. On December 17, 1997, Budget's principals met with "its new partners," and on December 18 Budget advised the railroad it would be participating "with the Brittan group" to purchase the property. On January 8, 1998, the railroad indicated its willingness to enter a purchase agreement with Budget and the Brittan/Goldman/Janger group. Brittan understood that a condition of the purchase and sale was his dismissal of his lawsuit against the railroad and execution of a release, which Brittan agreed to furnish.

On September 20, 1998, the railroad advised that it had executed an agreement with Beverly Hills Land Company to swap certain interests, thereby assuring the railroad's ability to convey a 98.2 percent interest in Parcels 1 and 2 which the railroad had agreed to sell to Budget, Brittan, Goldman, and Janger.

On September 23, 1998, Brittan, Goldman, and Janger agreed among themselves to "be equal partners and proceed with the transaction." They agreed: (A) they would form a limited liability company for the purpose of entering the purchase agreement with the railroad and with Budget; (B) each

of them would make an initial capital contribution of $40,000, of which $104,693 would be used as a deposit in escrow for the purchase from the railroad along with Budget, the balance to be used for expenses relating to "due diligence" investigation of potentials for development; (C) if the limited liability company proceeded with the purchase, each of them would contribute one-third of the balance of the purchase price required of the limited liability company, and share equally in its profits and losses; (D) Brittan would deposit into escrow a dismissal of his lawsuit against the railroad and a release; and (E) upon acquiring title to Parcel 1, the limited liability company would deed to Brittan the easement rights he sought in the lawsuit against the railroad. Brittan, Goldman, and Janger agreed among themselves to work out in good faith an arrangement with Brittan, who desired to obtain sole title to that portion of Parcel 1 adjacent to the Brittan property for a smaller price per square foot than the price per square foot for the entire Parcel 1. On September 25, 1998, Janger "filed an LLC-1 with the California Secretary of State, thereby creating BGJ."

The officers and directors of the company which owns Budget formed defendant M2B2 for the purpose of entering with BGJ an agreement to purchase Parcels 1 and 2 from the railroad and a "closing and tenancy in common agreement."

On November 6, 1998, negotiations were completed on a purchase and sale agreement and escrow instructions relating to the sale of Parcels 1 and 2 by the railroad to BGJ and M2B2, and the closing and tenancy in common agreement between BGJ and M2B2. Execution copies of these documents were sent to BGJ.

On November 9, Brittan (who had independent counsel), Goldman, and Janger orally agreed among themselves to perform all the duties and obligations required of BGJ including that Brittan would deposit into escrow his dismissal of the lawsuit against the railroad and a release, each would make an immediate capital contribution of $40,000, of which $104,693 would be a deposit in escrow, and they reconfirmed their September 20 agreement. Pursuant to the November 9 oral agreement, BGJ forwarded executed copies of the purchase agreement and tenancy agreement to the railroad and to M2B2 respectively, Brittan, Goldman, and Janger made immediate capital contributions of $40,000 each, of which $104,693 was deposited in escrow, and Goldman and Janger on behalf of BGJ made further due diligence investigations.

The purchase agreement with the railroad provided that (A) either BGJ or M2B2 could elect to "opt out" of the purchase agreement by 5:00 p.m. on

December 21, 1998, leaving the other party with the right to purchase Parcels 1 and 2 for its own benefit, and (B) escrow would close on December 30, 1998.

Meanwhile, between November 9 and November 29, 1998, Brittan, Goldman, and Janger discussed their oral operating agreement and agreed "that Goldman and Janger would proceed as the sole members of BGJ, and Brittan would be given an option to purchase certain property west of Charleville, adjoining the Brittan Property, at a favorable price."

On December 6, 1998, Goldman had a conversation with Wilson concerning potential development of the Wilson property in conjunction with the portion of Parcel 1 adjacent to the Wilson property. In that conversation Wilson opined that BGJ was paying too much for Parcel 1. On December 7, 1998, Goldman related that information to Brittan and Janger. Goldman and Janger said they were having second thoughts about the purchase and might, as the majority members of BGJ, elect not to proceed with the purchase agreement when the December 21, 1998, opt-out deadline arrived. Brittan told them that if they elected not to proceed he had other potential investors who might proceed with him and would like the opportunity to discuss it with other investors. Goldman and Janger told Brittan that he did not have permission to negotiate, without their participation, any terms of the purchase agreement with the railroad or the tenancy agreement with M2B2, but that if on December 21 they elected not to proceed, and Brittan had other investors willing to go forward, they would "step aside upon reimbursement of their due diligence costs and payment for the reasonable value of Janger's legal services." Brittan agreed to these terms.

On December 8, 1998, Janger informed M2B2's in-house counsel that it was likely BGJ would elect not to proceed with the purchase when the December opt-out deadline arrived. M2B2's counsel asked if M2B2/Budget could approach Brittan and Wilson about going forward with them. Janger stated that he and Goldman had no objection to such discussions, provided that no agreement be reached unless Goldman and Janger did, in fact, elect on December 21 not to proceed, and that M2B2/Budget not negotiate with the railroad without Goldman's and Janger's participation.

On December 14, 1998, Brittan advised Janger that because Janger and Goldman had, allegedly, "passed" on the purchase, Brittan intended to proceed to acquire the property without Goldman's and Janger's participation. Janger replied that he and Goldman had not yet "passed," that they had until December 21 to make further due diligence investigation and decide whether to proceed with the purchase. Brittan stated he had investors willing

to step into Goldman's and Janger's shoes, and Brittan "admitted later in that same conversation that he had, in fact, negotiated a new deal with Wilson pursuant to which Brittan would acquire the portion of Parcel 1 adjacent to the Brittan Property at a price which Goldman and Janger had not been willing to assign to that portion of the property, and Wilson would acquire the balance of Parcel 1." Janger warned Brittan that Goldman and Janger had not yet opted out of the purchase and that Brittan should not consummate any new arrangements until Goldman and Janger made their final decision.

On December 15, 1998, Goldman and Janger decided *to proceed* with the purchase. When Janger on that date notified Brittan, Brittan indicated he would refuse to perform his part of the November 1998 oral operating agreement with Goldman and Janger. When Janger on December 15 informed M2B2 of the intention to proceed with the purchase rather than to opt out on December 21, M2B2 responded that M2B2 had already made a new deal with Brittan and Wilson. On December 16, M2B2 informed BGJ that it would "close the Purchase Agreement without the participation of BGJ." On plaintiffs' information and belief, M2B2 refused to close the transaction with BGJ because M2B2 "had entered into a new and different agreement with Brittan and Wilson pursuant to which Brittan and Wilson would contribute BGJ's portion of the purchase price for Parcels 1 and 2, Brittan would deposit the Release and Dismissal in escrow for the benefit of M2B2, and Brittan and Wilson would then be granted an interest in M2B2, which would be converted into ownership of Parcel 1, or they would otherwise be deeded Parcel 1, on or after the close of escrow." On December 23 and December 29, 1998, M2B2 notified the railroad that Brittan's release and dismissal would be deposited into escrow only if the railroad deeded the property to M2B2 alone, to the exclusion of BGJ.

BGJ did not opt out of the purchase agreement by the December 21, 1998, deadline. Subject only to Brittan's depositing his dismissal and release into escrow, BGJ was ready, willing, and able to close the purchase agreement and tenancy agreement by the December 30 closing deadline. Goldman and Janger were ready, willing, and able to perform all terms of the November oral agreement with Brittan. Despite Goldman's and Janger's demands upon him, Brittan refused to deposit his dismissal and release into escrow for the benefit of BGJ. On plaintiffs' information and belief, Brittan, Wilson, and M2B2 agreed among themselves that Brittan would refuse to deposit his dismissal and release into the escrow, thereby disabling BGJ from performing its obligations under the purchase agreement; in return, upon the contribution of Brittan and Wilson of BGJ's portion of the purchase price, M2B2 agreed to grant them an interest in M2B2 which would result in their ownership of Parcel 1 or a direct interest in Parcel 1.

On December 23, 1998, counsel for Goldman and Janger notified the parties that Goldman and Janger were ready, willing, and able to deposit the required funds in escrow, demanded that Brittan deposit the dismissal and release, "and serv[ed] notice that anyone purporting to take title to any portion of Parcel 1 would do so as a constructive trustee for BGJ, Goldman and Janger."

On plaintiffs' information and belief, on or before January 11, 1999, Brittan deposited into the escrow his dismissal and release for the benefit of M2B2 only; title to Parcels 1 and 2 vested in M2B2; and in consideration for Brittan's and Wilson's contributions of BGJ's portion of the purchase price and Brittan's deposit of his dismissal and release, M2B2 granted Wilson and Brittan an interest either in M2B2 or in Parcel 1. On plaintiffs' information and belief, "BGJ's deposit of $104,693 was credited to M2B2 against the purchase price for Parcels 1 and 2, and that the benefit of such credit was realized or will be realized by Brittan and/or Wilson when they acquire title to some or all of Parcel 1."

### Relief Requested in Complaint

Plaintiffs filed their complaint on January 26, 1999, and recorded a notice of pendency of action, as to Parcel 1, on January 27, 1999. They alleged the following 11 causes of action and prayers for relief:

First: Goldman and Janger against Brittan for breach of oral contract; for compensatory damages.

Second: Goldman and Janger against Brittan for breach of fiduciary duty; for compensatory and punitive damages.

Third: BGJ against M2B2 for breach of fiduciary duty; for compensatory and punitive damages.

Fourth: BGJ, Goldman, and Janger against M2B2, Brittan, Wilson, and Does 1-35, for unjust enrichment; defendants "would be unjustly enriched if allowed to retain the benefits which they have achieved by their wrongful conduct. Consequently, said defendants hold whatever interest they may have acquired in Parcel 1, or in any entity possessing an interest in Parcel 1, as constructive and involuntary trustees for the benefit of BGJ, Goldman and Janger. [¶] . . . Said defendants should also be required to disgorge and surrender any and all economic advantage which they have achieved by virtue of their wrongful conduct."

Fifth: Goldman and Janger against M2B2, Wilson, and Does 1-35 for intentional interference with contractual relations; for compensatory and

punitive damages and "whatever interest they have acquired in Parcel 1, or in any entity possessing an interest in Parcel 1, as constructive and involuntary trustees for the benefit of Goldman and Janger" (constructive trust allegation).

Sixth: Goldman and Janger against M2B2, Wilson, and Does 1-35 for negligent interference with contractual relations; for compensatory damages and constructive trust.

Seventh: BGJ against Brittan, Wilson, and Does 1-35 for intentional interference with contractual relations; for compensatory and punitive damages and constructive trust.

Eighth: BGJ against Brittan, Wilson, and Does 1-35 for negligent interference with contractual relations; for compensatory damages and constructive trust.

Ninth: Goldman and Janger against M2B2, Wilson, and Does 1-35 for inducing breach of contract; for compensatory and punitive damages and constructive trust.

Tenth: BGJ against M2B2, Brittan, Wilson, and Does 1-50 for imposition of a constructive trust; "By virtue of the agreements . . . it was understood and agreed that BGJ and M2B2 would proceed to acquire Parcels 1 and 2 and divide those parcels with BGJ owning an undivided 98.2% interest in Parcel 1, and pending the division of the parcels, granting BGJ the exclusive right to control and develop Parcel 1, as between BGJ and M2B2"; as a consequence of the conduct [of defendants], "BGJ has been wrongfully deprived of the right to own, control or develop Parcel 1"; defendants "hold their interest in Parcel 1, and any interest which they may have acquired relating to Parcel 1, as constructive trustees for the benefit of BGJ."

Eleventh: Goldman and Janger[3] against M2B2, Brittan, Wilson, and Does 1-50 for imposition of a constructive trust; as a consequence of defendants' conduct, "Goldman and Janger have been wrongfully deprived of their right to own or control an undivided 98.2% interest in Parcel 1 as members of BGJ and/or partners of Brittan"; defendants "hold their interest in Parcel 1, and any interest which they may have acquired relating to Parcel 1, as constructive trustees for the benefit of Goldman and Janger."

As to those causes of action which included an allegation of a constructive trust, the prayer for relief requests "an order compelling defendants to

---

[3]The complaint in the 11th cause of action refers to "Plaintiffs Goldman and Brittan," an obvious clerical error.

convey [to BGJ, or to BGJ, Goldman, and Janger, or to Goldman and Janger] their interest in Parcel 1," and "an order granting [to BGJ, or to BGJ, Goldman, and Janger, or to Goldman and Janger] possession of Parcel 1."[4]

### Motion to Expunge Lis Pendens

Defendants moved pursuant to section 405.31 to expunge the lis pendens on the ground that the complaint did not allege a real property claim. Defendants asserted that the allegations of the complaint do not entitle any of the plaintiffs to "legal title" or possession, and that the action is essentially for money damages. They cited *Lewis* v. *Superior Court, supra,* 30 Cal.App.4th 1850, which holds that allegations of the equitable remedy of a constructive trust, even if colorable, will not support a lis pendens if those allegations act only as a collateral means to collect money damages. Plaintiffs replied that unlike *Lewis*, the claims of wrongful conduct in this case relate to the specific property which is the subject of the lis pendens, and that they are not seeking the property as collateral for money damages but rather, "[p]laintiffs want the property for which they bargained." Defendants replied that the gravamen of the action is for money damages, not "specific performance."[5] The trial court by minute order ruled: "[Defendants' motion] is granted. *Lewis* v. *Superior Court* . . . is controlling. Complaint does not involve a real property claim."

### DISCUSSION

### Legal Background

As this court summarized in *Urez Corp.* v. *Superior Court* (1987) 190 Cal.App.3d 1141, 1144-1145 [235 Cal.Rptr. 837]: a lis pendens is a recorded document giving constructive notice that an action has been filed affecting title or right to possession of the real property described in the notice. Its effect is that anyone acquiring an interest in the property after the action was filed will be bound by the judgment. The history of lis pendens legislation shows a legislative intent to restrict the common law notion of constructive notice. This is because of the ease with which a lis pendens can be recorded

---

[4] For the purpose of the present petition for a writ of mandate, real party M2B2, the only defendant responding to the petition, admits the following allegations of the petition: the separate deal closed; M2B2 acquired the railroad's 98.2 percent interest in Parcels 1 and 2 on January 11, 1999; M2B2 subsequently transferred interests in Parcels 1 and 2 to Brittan and Wilson; M2B2 is in the process of applying for governmental approval to permanently divide Parcels 1 and 2 into three separate lots, and once this is accomplished defendants have agreed that Wilson and Brittan will be the sole owners of Parcel 1, which BGJ was to have acquired under its agreement with M2B2.

[5] The present action is not for specific performance, and the railroad is not a party, but for lis pendens purposes plaintiffs analogize their claim to a specific performance action.

and the serious consequences flowing from it. Once a lis pendens is filed, it clouds the title and effectively prevents the property's transfer until the litigation is resolved or the lis pendens is expunged. Accordingly, lis pendens is a provisional remedy which should be applied narrowly.

A lis pendens notice may be recorded in an action which has a "real property claim," which is defined by statute as "the cause or causes of action in a pleading which would, if meritorious, affect . . . title to, or the right to possession of, specific real property." (§ 405.4.) The statute provides no further definition of "affect . . . title to, or the right to possession of," specific real property, nor has case law provided any abstract definition. (*Urez Corp.* v. *Superior Court, supra,* 190 Cal.App.3d at p. 1145; Cal. Lis Pendens Practice, *supra,* §§ 3.15, 3.20, at pp. 105-106, 111.) Case law has determined that certain types of actions clearly do, or clearly do not, affect title or possession. (Cal. Lis Pendens Practice, *supra,* §§ 3.20-3.40, at pp. 111-123; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1999) ¶¶ 15:27-15:44, pp. 15-5 to 15-9 (rev. #1 1999); 3 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 8:123, pp. 501-507.) At one extreme, "[a] buyer's action for specific performance of a real property purchase and sale agreement is a classic example of an action in which a lis pendens is both appropriate and necessary." (Cal. Lis Pendens Practice, *supra,* § 3.21, at p. 112; *Hilberg* v. *Superior Court* (1989) 215 Cal.App.3d 539, 542 [263 Cal.Rptr. 675]; *Stewart Development Co.* v. *Superior Court* (1980) 108 Cal.App.3d 266, 272-273 [166 Cal.Rptr. 450].) At the other extreme, an action for money *only,* even if it relates in some way to specific real property, will not support a lis pendens. (*Ziello* v. *Superior Court* (1995) 36 Cal.App.4th 321, 332 [42 Cal.Rptr.2d 251]; *Deane* v. *Superior Court, supra,* 164 Cal.App.3d 292, 297.)

Cases in which the plaintiff seeks a constructive trust relating to real property have been troublesome, in part because of the wide variety of circumstances in which a constructive trust may be an appropriate remedy. (*La Paglia* v. *Superior Court* (1989) 215 Cal.App.3d 1322, 1327 [264 Cal.Rptr. 63].) "A constructive trust is not a true trust but an equitable *remedy* available to a plaintiff seeking recovery of specific property in a number of widely differing situations. The cause of action is not based on the establishment of a trust, but consists of the fraud, breach of fiduciary duty, or other act that entitles the plaintiff to some relief. That relief, in a proper case, may be to make the defendant a constructive trustee with a duty to transfer to the plaintiff." (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 796, p. 252, italics in original.)

Two early cases took the position that an action in which the plaintiff seeks a constructive trust on specific real property clearly "affects" title to or

the right to possession of such property, and therefore supports a lis pendens. (*Coppinger* v. *Superior Court* (1982) 134 Cal.App.3d 883, 890-891 [185 Cal.Rptr. 24] [purchaser of house infested with termites sought damages, rescission of the purchase, and a constructive trust on seller's *new* property]; *Okuda* v. *Superior Court* (1983) 144 Cal.App.3d 135, 141 [192 Cal.Rptr. 388] [purchaser who improved property and then discovered seller had failed to convey title sought damages and an equitable lien on the property for the cost of good faith improvements].) Subsequent cases have distinguished, limited, or explicitly rejected the reasoning of *Coppinger* and *Okuda*, and concluded that the allegation of a constructive trust should not be construed as a real property claim within the meaning of the lis pendens statute. (*Burger* v. *Superior Court* (1984) 151 Cal.App.3d 1013, 1018-1019 [199 Cal.Rptr. 227]; *Deane* v. *Superior Court, supra,* 164 Cal.App.3d 292, 296-297; *Urez Corp.* v. *Superior Court, supra,* 190 Cal.App.3d 1141, 1145-1149; *Elder* v. *Carlisle Ins. Co.* (1987) 193 Cal.App.3d 1313, 1320, fn. 8 [238 Cal.Rptr. 897]; *Wardley Development Inc.* v. *Superior Court* (1989) 213 Cal.App.3d 391, 394-396 [262 Cal.Rptr. 87]; *La Paglia* v. *Superior Court, supra,* 215 Cal.App.3d 1322, 1326-1329; *Lewis* v. *Superior Court, supra,* 30 Cal.App.4th 1850, 1862-1866; see also *Moseley* v. *Superior Court* (1986) 177 Cal.App.3d 672, 677 [223 Cal.Rptr. 116] [dictum].)

The latter cases all involve situations in which the action was essentially for money. In *Burger* v. *Superior Court, supra,* 151 Cal.App.3d 1013, the plaintiff church advanced money to the defendant Gus, which Gus was supposed to use to improve the church's property but wrongfully used to improve a different property, which Gus transferred to Burger. The court held the church's claim to an equitable lien did not support a lis pendens, because ". . . Church's claim is similar to that of almost any lender of money to a defaulting debtor who happens to own real property." (*Id.* at p. 1019.) In *Deane* v. *Superior Court, supra,* 164 Cal.App.3d 292, the defendants owed commissions to a real estate broker. "[D]efendants merely owe plaintiffs a debt at the most." (*Id.* at p. 297.) In *Urez Corp.* v. *Superior Court, supra,* 190 Cal.App.3d 1141, a secured lender whose junior interest was eliminated by a foreclosure sale instituted a fraud action against the buyer and sought a constructive trust for the purpose of securing payment of the amounts due under his second trust deed. He did "not seek recission of the foreclosure sale or conveyance of the subject property to himself. At bottom, the 'beneficial' interest real party claims in the subject property is for the purpose of securing a claim for money damages." (*Id.* at p. 1149.) In *Elder* v. *Carlisle Ins. Co., supra,* 193 Cal.App.3d 1313, the plaintiffs obtained money damages for good faith improvements on the subject property. They were not entitled to collect on an undertaking given to expunge a lis pendens, because " 'ultimately, those allegations act only as a collateral

means to collect money damages.' " (*Id.* at p. 1320, fn. 8.) In *Wardley Development Inc.* v. *Superior Court, supra,* 213 Cal.App.3d 391, a judgment debtor transferred cash to the real party in interest, who used it to purchase real property. The judgment creditor was not entitled to a lis pendens, because the creditor's only interest in the property was as collateral to secure money damages. (*Id.* at pp. 394, 396.) In *La Paglia* v. *Superior Court, supra,* 215 Cal.App.3d 1322, funds wrongfully withheld from the plaintiff Rey's predecessor were used to buy the property. "Rey does not claim any present right to title or possession of the property over which it seeks to impose a trust. . . . Rey claims an interest in the defendant's property only to the extent the monies it alleges were wrongfully obtained have been invested therein." (*Id.* at p. 1327.) In *Lewis* v. *Superior Court, supra,* 30 Cal.App.4th 1850, the wrongdoer used misappropriated funds to buy the property. "The fact that someone buys property with stolen money does not make the victim the owner of that property as a matter of real property law." (*Id.* at p. 1863.)

 In rejecting *Coppinger's* broad interpretation of whether a constructive trust "affects" real property for purposes of a lis pendens, the later cases were guided by strong policy concerns favoring a restrictive application of lis pendens. Courts have long recognized that "[b]ecause the recording of a lis pendens place[s] a cloud upon the title of real property until the pending action [is] ultimately resolved . . . , the lis pendens procedure [is] susceptible to serious abuse, providing unscrupulous plaintiffs with a powerful lever to force the settlement of groundless or malicious suits." (*Malcolm* v. *Superior Court* (1981) 29 Cal.3d 518, 524 [174 Cal.Rptr. 694, 629 P.2d 495]; see also *id.* at p. 523.) In *Hilberg* v. *Superior Court, supra,* 215 Cal.App.3d 539, 542, the court stated, "We cannot ignore as judges what we know as lawyers—that the recording of a lis pendens is sometimes made not to prevent conveyance of property that is the subject of the lawsuit, but to coerce an opponent to settle regardless of the merits. . . ." (Citation omitted.) "The financial pressure exerted on the property owner may be considerable, forcing him to settle not due to the merits of the suit but to rid himself of the cloud upon his title. The potential for abuse is obvious." (*La Paglia* v. *Superior Court, supra,* 215 Cal.App.3d at p. 1326.) We have stated, "It must be borne in mind that the true purpose of the lis pendens statute is to provide notice of pending litigation and not to make plaintiffs secured creditors of defendants nor to provide plaintiffs with additional leverage for negotiating purposes." (*Urez Corp.* v. *Superior Court, supra,* 190 Cal.App.3d at p. 1149.)

Therefore, in approaching the constructive trust cases, the courts have "consistently eschewed" an approach which would "transform [lis pendens] into a money-collection remedy without any of the protections of the attachment statutes." (*Lewis* v. *Superior Court, supra,* 30 Cal.App.4th at p. 1864.)

"Overbroad definition of 'an action . . . affecting the title or the right of possession of real property' would invite abuse of lis pendens." (*Burger* v. *Superior Court, supra,* 151 Cal.App.3d at p. 1018.) For such reasons, we declared in *Urez Corp.* v. *Superior Court, supra,* that lis pendens is not available in what "is *essentially* a fraud action seeking money damages with additional allegations urged to support the equitable remedies of a constructive trust or an equitable lien." (190 Cal.App.3d at p. 1149, italics added; see also *Hunting World, Inc.* v. *Superior Court, supra,* 22 Cal.App.4th 67, 73-74 [lis pendens held proper in an action to set aside a fraudulent conveyance; distinguishing cases in which ". . . constructive trust or equitable lien causes of action were *appended* to lawsuits centering on money damages" (italics in original)].) In determining whether the claims in the pleading affect title to or possession of specific real property the courts have not interpreted "affect" literally; they have looked instead to the substance of the dispute. The issue presented is a question of law for the appellate court's de novo review. (*Urez Corp.* v. *Superior Court, supra,* 190 Cal.App.3d at p. 1149.)

## Application to This Case

 The basic theory of plaintiffs' case is that plaintiffs had a joint venture agreement with Brittan and M2B2 to buy the subject property, but Brittan and M2B2, in breach of their fiduciary duties, together with Wilson, wrongfully acquired the subject property for themselves to the exclusion of plaintiffs.

 Where partners or joint venturers have agreed to buy a specific parcel of real property, and one partner or joint venturer, in breach of a fiduciary duty, wrongfully acquires it in his own name, the other partner or joint venturer may bring an action to impose a constructive trust and require the wrongdoing partner or joint venturer to convey the appropriate share of the legal title. (*Koyer* v. *Willmon* (1907) 150 Cal. 785, 787-788 [90 P. 135]; *Jaffe* v. *Heffner* (1959) 173 Cal.App.2d 512, 516 [343 P.2d 374]; *Sadugor* v. *Holstein* (1962) 199 Cal.App.2d 477, 481, 483 [18 Cal.Rptr. 859].) Assuming the truth of plaintiffs' allegations, as we must in this demurrer-like context, plaintiffs may be entitled to imposition of a constructive trust requiring the defendants to convey to plaintiffs the share of the legal title plaintiffs would have acquired had not the defendants breached their duties toward plaintiffs.

 Plaintiffs' entitlement to a constructive trust is not determinative of whether plaintiffs may maintain a lis pendens. (*Burger* v. *Superior Court, supra,* 151 Cal.App.3d at p. 1018.) But this case is unlike any of the cases in

the line from *Burger* to *Lewis*, because here plaintiffs do not seek a constructive trust remedy "solely" as "collateral" for money damages. *In part* they seek to be awarded title to the same specific real property, the property they bargained for, which is the subject of the same wrongful conduct giving rise to the constructive trust remedy in the first place. (See *La Paglia* v. *Superior Court, supra,* 215 Cal.App.3d at p. 1327, noting the distinction.) They analogize to a specific performance action, which unquestionably supports a lis pendens. They say the only difference here is that plaintiffs were deprived of the specific property by the wrongful conduct of their own copurchasers rather than of a defaulting seller.

But on the other hand, in the specific performance analogies cited by plaintiffs, the action was *solely* for specific performance. (*Hilberg* v. *Superior Court, supra,* 215 Cal.App.3d 539, 541; *Nash* v. *Superior Court* (1978) 86 Cal.App.3d 690, 692 [150 Cal.Rptr. 394].) Plaintiffs' complaint has 11 causes of action. Only the 10th and 11th causes of action focus narrowly on imposition of a constructive trust. The other causes of action seek compensatory and punitive damages on fraud and tort theories, or a combination of compensatory and punitive damages with imposition of a constructive trust.

Plaintiffs say that at this pleading stage they are not required to elect between inconsistent remedies, and they are reserving their options. It is apparent that, depending on market conditions, or circumstances affecting the particular parcel of property, or other tactical considerations, plaintiffs may ultimately decide, if they prevail, that they prefer to be compensated by money damages rather than transfer of title to the property.

The question presented is whether plaintiffs are entitled to maintain a lis pendens on the property in the meantime. We conclude that in the particular circumstances of this case they may not. Plaintiffs contend that they have pleaded one or more causes of action which state a real property claim within the meaning of section 405.4, and that the lis pendens statute makes no provision requiring them to elect remedies between alternative causes of action. We do not hold that the lis pendens statute requires an early election of remedies between monetary damages or a constructive trust. But what the Legislature has done in section 405.4 is to leave to the courts to determine in particular cases whether a claim supporting a constructive trust will justify the maintenance of a lis pendens. (Comment to § 405.4 ["The definition of 'real property claim' neither includes nor excludes claims of constructive trust or equitable lien. Instead, the law in this area is left for judicial development."].) In determining this issue on a case-by-case basis, the courts have been restrictive because of well-known dangers that the lis pendens procedure can be abused to coerce a defendant to settle a claim. The courts

have looked to the substance of the dispute to determine whether it is "essentially" a fraud action seeking money damages, with constructive trust allegations "appended." (See *Urez Corp.* v. *Superior Court, supra,* 190 Cal.App.3d at p. 1149; *Hunting World, Inc.* v. *Superior Court, supra,* 22 Cal.App.4th at pp. 73-74.) In a case such as this where the pleading combines theories of liability for monetary damages and for a constructive trust, we hold that plaintiffs should not be able to maintain a lis pendens. The danger is too great that a lis pendens, which effectively renders the property unmarketable, will have the coercive effects condemned by the cases.

## DISPOSITION

The order to show cause, having served its purpose, is discharged. The petition for a writ of mandate is denied. The parties shall bear their own costs.

Hastings, J., and Curry, J., concurred.

Petitioners' application for review by the Supreme Court was denied January 13, 2000.