Filed 10/22/21  King v. May-Wesely CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RON KING, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> MERINNA MAY-WESELY et al., <br><br> Defendants and Respondents. | F080224 <br><br> (Super. Ct. No. 2024022) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Roger M. Beauchesne, Judge.

Serlin & Whiteford and Mark A. Serlin for Plaintiff and Appellant.

Daniel S. Glass; Germain Law and Michael R. Germain for Defendants and Respondents.

-ooOoo-

A creditor holding a nondischargeable judgment for $12 million sued the judgment debtor, the judgment debtor's wife, and a corporation currently owned by the wife in an action alleging fraudulent transfers, conspiring to defraud creditors, and aiding and abetting fraud on creditors.  After a bench trial, the trial court issued a statement of decision concluding that the judgment creditor "has failed to establish his case on all

three causes of action and theories by a preponderance of the evidence." The court entered judgment in favor of the judgment debtors.

The judgment creditor appealed, contending he had established the challenged transfers of assets were voidable under the Uniform Voidable Transactions Act (UVTA) which contains an actual fraud test and a constructive fraud test. (Civ. Code, §§ 3439–3439.14.) (Unlabeled statutory references are to the Civil Code.) A transfer is voidable based on constructive fraud if the debtor (1) made the transfer without receiving reasonably equivalent value in exchange and (2) was insolvent at the time of the transfer. (§ 3439.05, subd. (a).) A pretrial stipulation by the parties established the judgment debtor was insolvent when he made the challenged transfers in 2015 and 2016. Also, the evidence in the record compels a finding that the judgment debtor did not receive reasonably equivalent value (1) when he transferred $170,000 to his wife to use in purchasing real estate in which he received a 2 percent interest or (2) when he surrendered his shares in the defendant corporation without receiving anything in return. Thus, pursuant to section 3439.07, subdivision (a), the judgment creditor is entitled to a judgment voiding those transfers.

We therefore reverse the judgment.

## FACTS

Plaintiff Ron King owned a cabinet making business in the 1990's and early 2000's. The business was organized as a corporation named National West Manufacturing, Inc.[1] King retained defendant Stephen M. House as his certified public accountant, and they became close friends. House embezzled millions of dollars from King's business by telling King to send his tax deposits to House's firm instead of

---

[1]Records filed with the California Secretary of State and available online show the corporation filed its articles of incorporation in November 1985 and a certificate of dissolution in February 2008. We have not taken judicial notice of the official records because these facts are provided as background and do not affect the outcome of this appeal.

2.

sending them directly to the taxing authorities. House kept the money and filed false tax returns on behalf of King and his company. When the scheme was discovered, the taxing authorities notified King that he owed millions of dollars in back taxes. These events resulted in the loss of King's business and the demise of his marriage.

Federal criminal charges were brought against House. In October 2006, House pleaded guilty to one count of wire fraud (18 U.S.C. § 1343) and was sentenced to 63 months in federal prison and supervised release for a term of three years. The federal court recommended that House be incarcerated in a California facility and that House "participate in the 500-Hour Bureau of Prisons Substance Abuse Treatment Program." The court also directed House to pay approximately $4.4 million in restitution to eight different people or entities. The restitution to be paid to National West Manufacturing, Inc., was $3,040,817.

In 2005, House filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division. King filed an adversary proceeding in House's bankruptcy case, seeking to have House's debt declared nondischargeable based on fraud. On October 25, 2006, the bankruptcy court entered a judgment in favor of King and National West Manufacturing, Inc., in the amount of $11,739,168. The judgment was "adjudged non-dischargeable within the meaning of 11 U.S.C. section 523(a)(2) and 11 U.S.C. section 523(a)(4)."

In 2007, while House was in prison, he filed a motion in the bankruptcy court to set aside the nondischargeable judgment entered in favor of King. The bankruptcy court denied House's motion.

In 2011, after House was released from prison, he was involved in the incorporation of California Almond Pollination Service, Inc. (Pollination Inc.), and became its director of operations. His responsibilities included (1) obtaining pollination accounts from almond growers who would lease bees from Pollination Inc. and (2) obtaining those bees by entering into leases with beekeepers.

3.

In 2013, House became the sole shareholder of Pollination Inc. and continued to act as the director of operations.

In April 2014, House signed a $300,000 check made payable to cash and drawn on Pollination Inc.'s account at Tri Counties Bank. House testified the bank had told him Pollination Inc.'s account had been hacked and had suggested opening a new account. House left a small amount in the existing account to cover outstanding checks and automatic withdrawals and transferred the $300,000 to another account at Tri Counties Bank.

In April 2015, House surrendered his shares to Pollination Inc. There is no evidence that Pollination Inc. paid House anything in exchange for his shares. During the trial, House testified about an amount shown in the financial records as "owner contraction" and stated it had been rent paid to him.

House's federal tax forms for 2015 show that Pollination Inc. paid him $86,250 in wages and $75,000 in nonemployee compensation. House testified the $75,000 would have been either rent for beehives he owned or charges for the use of his truck, trailer, and forklift to unload other beekeepers' hives.

In March 2016, House met defendant Merinna May-Wesely, a registered nurse who works full time. Prior to their meeting, May-Wesely had no experience in the bee business.

On April 1, 2016, May-Wesely acquired all the shares of Pollination Inc. She testified the agreement was that she had about a year to decide if she wanted to give the shares back or conclude her purchase of the business. Pollination Inc. held her note for $50,000 while she decided whether to continue with the purchase or back out and return the shares.

On May 1, 2016, House and May-Wesely signed a prenuptial agreement. House attached a list of creditors to the agreement, but King was not listed among them. On May 19, 2016, House and May-Wesely were married.

4.

In July 2016, House deposited a check for $170,000 directly into May-Wesely's bank account. In his deposition, House described the transfer as a gift. During the trial, House testified, "I gave her 170,000. She gave me a hundred seventy thousand. We put it into an escrow account to purchase a house." House reiterated this testimony, stating: "I believe my attorney sent you documents showing she gave me 170 and I gave her 170, and we purchased a piece of property."

The grant deed for the Geer Road property stated the seller "hereby GRANTS to Stephen House, as to an undivided 2% interest and Merinna May-Wesely, as to an undivided 98% interest, as tenants in common," in the property. At trial, House confirmed the grant deed related to the property where he was living and confirmed it reflected that he had an undivided 2 percent interest. The court received the grant deed into evidence.

Like House, May-Wesely testified that, under the grant deed for the Geer Road property, she owned 98 percent and House owned 2 percent. She confirmed that they put $340,000 into escrow to close the purchase of the property and stated none of that money was returned to House. May-Wesely also testified: "We had an agreement when we purchased this property that I would put money in to take care of the repairs, because there was a lot of deferred maintenance on the property; that I would take care of all the mortgage payments, the property taxes, and I would take care of the balance of whatever was due on the mortgage."[2] Explaining the reasoning behind the agreement, May-

---

[2]May-Wesely's testimony is consistent with her interrogatory responses, which stated the $170,000 from House and $170,000 of her separate property funds were deposited into escrow and most of the $340,000 was paid to the seller of the real property being acquired. Her responses also stated that, in addition to depositing an equal amount into the escrow, she agreed to (1) pay all mortgage payments to the seller, which were about $4,000 per month on a principal amount of $738,500, (2) pay all deferred maintenance and repairs on the property, (3) pay for the cost of replacing an orchard on the property, and (4) pay all insurance, property taxes, and ongoing maintenance for the property.

Wesely testified: "So basically from this day forward, I am responsible for everything from that day at the title company. That's why I have 98 percent."

Pollination Inc. rents all of the Geer Road property from May-Wesely and House, except for about an acre containing the residence. Pollination Inc. paid rent of $4,000 per month, which was increased to $4,520 per month on January 1, 2019. The rental payment was sufficient to cover May-Wesely's monthly mortgage payment on the property.

In September 2016, King filed an application for and renewal of judgment in the bankruptcy court. After credits were subtracted and postjudgment interest was added, the total renewed judgment was $16,587,522.18. The bankruptcy court issued a notice of renewal of judgment, which was served on House by mail on September 14, 2016.

House's federal tax forms for 2016 indicate Pollination Inc. paid him $141,250 in wages and $104,000 in rent.

House testified at trial that in 2017 he had several medical issues, cut back on both administrative and field work, and hired a full-time foreman to do what he had done in the field. His federal tax forms show that Pollination Inc. paid him $11,000 in wages and $144,000 in rent during 2017.

May-Wesely's federal tax forms for 2017 show that Pollination Inc. paid her $27,500 in wages and $160,400 in rent. The 2017 form 1099-MISC showed Tuolumne River Honey, a fictitious business name used by May-Wesely, as the recipient of her rent payments. She testified that during 2017, she leased about 200 beehives to Pollination Inc. at $50 per hive.

Also in 2017, May-Wesely paid off the note used to purchase the shares in Pollination Inc. with a $50,000 check. The check was dated March 24, 2017, and made payable to the corporation.

## PROCEEDINGS

In January 2017, King conducted a judgment debtor examination of House. In March 2017, King began this litigation by filing a complaint against House, Pollination Inc., and May-Wesely. In February 2018, King filed a third amended complaint for damages alleging fraudulent transfers, conspiracy to defraud creditors, and aiding and abetting fraud on creditors. Three months later, defendants filed an answer.

The two-day court trial was held in April 2019. The parties addressed some of the material facts by stipulating in writing that (1) on October 25, 2006, a bankruptcy court issued a nondischarge judgment in favor of King and against House in the amount of $11,739,168; (2) the judgment was against House only and was valid and enforceable against House at all relevant times; (3) the unsatisfied amount of the judgment was in excess of the total value of House's assets at all relevant times; (4) House and May-Wesely were married on May 19, 2016; and (5) King did not, at any time, attempt to levy upon any of House's assets after the judgment was entered in October 2006.

King, House and May-Wesely testified during the trial. After the close of evidence, the trial court and counsel agreed to the submittal of posttrial briefs instead of closing arguments. Defendants requested a tentative decision and both sides requested a statement of decision.

In May 2019, the parties simultaneously filed the first round of posttrial briefs. King's posttrial brief asserted "a transfer can be fraudulent as to a creditor either by reason of the transferor's intent to defraud creditors (intentional fraud as per … § 3439.04(a)(1)) or by a transfer made while the debtor was insolvent and for which the debtor did not obtain reasonably equivalent value (constructive fraud per … § 3439.05)." King argued the undisputed evidence established both elements of constructive fraud. In June 2019, the parties' posttrial reply briefs were filed.

In August 2019, the trial court filed a tentative decision addressing three transactions—the $170,000 transfer from House to May-Wesely, a $22,000 transfer from

7.

House to Pollination Inc., and the transfer of shares in Pollination Inc. The tentative decision stated the court's determination that King had "failed to establish his case on all three causes of action and theories by a preponderance of the evidence." Part of the rationale provided stated:

> "The Court is cognizant of defense Counsel's repetition of the Renewal of Judgment in 20[1]6 and no attempts at collection during the timeframes of the alleged improper transfers in issue. [¶] Nevertheless, those two factors are indelible in the analysis of the causes of action. [¶] Knowledge and intent are crucial in attempting to cull the thought processes of the Defendants. [¶] Ultimately, [King] presented no evidence to establish the transfers were executed with fraudulent intent."

The tentative decision did not address constructive fraud, did not mention the stipulated facts resolved the element of insolvency, and made no explicit findings regarding the value House received in exchange for the transfers.

The tentative decision described certain procedural matters by stating both sides had requested a statement of decision and directing "defense counsel to prepare a statement of decision pursuant to California Rules of Court, rule 3.1590 subdivision (c)(3)."[3] The register of actions does not include an entry showing a proposed statement of decision or a proposed judgment was filed with the court or served on King's counsel. Also, the register of actions does not include an entry showing King filed objections to the proposed statement of decision or the proposed judgment.

On September 23, 2019, the trial court filed a statement of decision accompanied by a judgment after court trial. The disposition in the statement of decision provided:

---

[3]Subsequent references to a numbered "Rule" are to the California Rules of Court.

Rule 3.1590(f) provides in part: "A party that has been ordered to prepare the statement must within 30 days after the announcement or service of the tentative decision, serve and submit to the court a proposed statement of decision and a proposed judgment."

Rule 3.1590(g) provides in full: "Any party may, within 15 days after the proposed statement of decision and judgment have been served, serve and file objections to the proposed statement of decision or judgment."

"Based upon the evidence at trial and the post-trial briefing, the Court finds Judgment on all three causes of action in favor of Defendants. [King] has failed to establish his case on all three causes of action and theories by a preponderance of the evidence." The statement of decision addressed King's theory of actual fraudulent intent and concluded: "Ultimately, [King] presented no evidence to establish the transfers were executed with fraudulent intent." Like the tentative decision, the statement of decision did not mention constructive fraud or address its two elements—insolvency and the receipt of reasonably equivalent value in exchange for the transfers.

The clerk's transcript does not include a postjudgment motion for a new trial under Code of Civil Procedure section 657 or a postjudgment motion to set aside the judgment pursuant to Code of Civil Procedure section 663.[4] Similarly, there are no entries in the register of actions showing King filed any such motions.

In October 2019, defense counsel filed and served a notice of entry of judgment. King filed a timely appeal.

## DISCUSSION

### I. Basic Legal Principles

#### A. Uniform Voidable Transactions Act

In 1986, the Legislature enacted the Uniform Fraudulent Transfer Act. (Stats. 1986, ch. 383, § 2; see *Mejia v. Reed* (2003) 31 Cal.4th 657, 664.) It was designed for the protection of creditors. (*Lewis v. Superior Court* (1994) 30 Cal.App.4th 1850, 1873.)

In 2015, the Legislature amended the act and changed its name to the Uniform Voidable Transactions Act (UVTA; §§ 3439–3439.14). Under the UVTA, a transfer is

---

[4]Code of Civil Procedure section 634 provides: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue."

voidable as to present and future creditors if it was made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." (§ 3439.04, subd. (a)(1).) A nonexclusive list of factors relevant to determining the debtor's actual intent is contained in subdivision (b) of section 3439.04.

Even without actual fraudulent intent, a transfer is voidable as to present creditors under the constructive fraud test. (Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2021) ¶ 3:326, p. 3-131 (*Enforcing Judgments*).) Subdivision (a) of section 3439.05 provides:

> "A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if [1] the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and [2] the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

Insolvency is addressed in section 3439.02 and exists "if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." (§ 3439.02, subd. (a); *Enforcing Judgments, supra,* ¶ 3:327, p. 3-132.) Value is defined by section 3439.03:

> "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."

The term "reasonably equivalent value" is not defined by the UTVA. (*Enforcing Judgments, supra,* ¶ 3:325, p. 3-130.) Because the UTVA was designed to protect creditors, the determination of what constitutes "reasonably equivalent value" must be made from the standpoint of the transferor's creditors. (See *In re Prejean* (9th Cir. 1993) 994 F.2d 706, 708 [debtor's transfer of a security interest in satisfaction of an antecedent obligation arising from cash loans and services rendered constituted reasonably equivalent value where the obligation, but for the statute of limitations, was enforceable];

10.

*Hansen v. Cramer* (1952) 39 Cal.2d 321, 324 [conveyance void because it rendered defendant insolvent and she did not receive fair consideration for the conveyance].)

**B.      Standards of Review**

The three standards of appellate review play a significant role in this appeal because those standards and related principles control how the trial court's statement of decision is interpreted by this court.  In particular, they govern what inferences we draw to deal with the statement of decision's failure to explicitly address the constructive fraud theory.

**1.      *Questions of Law***

First, we independently review the trial court's resolution of questions of law. (*Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing* (2004) 119 Cal.App.4th 1038, 1048 (*Brasher's*).)  Under the independent standard of review, no deference is given to how the trial court decided the question of law.  (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492.)

**2.      *Explicit and Implicit Findings of Fact***

Second, "a trial court's explicit and implicit findings of fact in its statement of decision are reviewed under the substantial evidence standard." (*Brasher's*, *supra*, 119 Cal.App.4th at p. 1048; see *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [substantial evidence rule].)  Under that standard of review, "'the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below.  (*Crawford v. Southern Pacific Co.*[, *supra*,] 3 Cal.2d 427, 429.)  We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)  Evidence is "substantial" for purposes of this standard of review if

11.

it is of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935–936.)

To properly apply the substantial evidence standard, we must identify the circumstances in which an appellate court infers the statement of decision contains an implied finding. As relevant to this appeal, when a statement of decision contains ambiguities or omits a theory raised by a party *and* the ambiguity or omission was not brought to the trial court's attention, "the reviewing court will infer the trial court made every implied factual finding necessary to uphold its decision, even on issues not addressed in the statement of decision. The question then becomes whether substantial evidence supports the implied factual findings." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48.) The foregoing principle about implied findings is derived from the statutes governing statements of decision (Code Civ. Proc., §§ 632, 634) and the fundamental principle that appellate courts presume the trial court's judgment is correct, and, as a result, "'[a]ll intendments and presumptions are indulged to support it *on matters as to which the record is silent*, and error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, italics added.)

### 3.    *Failure of Proof Determinations*

The third standard of review relevant to this appeal applies to a trial court's determination that a party did not carry its burden of proof.

> "[I]t is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment…. [¶] [W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528; see *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

Thus, the finding-compelled-as-a-matter-of-law standard applies to a trial court's determination that a plaintiff failed to prove a particular element of a cause of action.

### 4. *Interpreting the Statement of Decision*

The trial court's statement of decision did not mention constructive fraud and did not address the elements of (1) House's insolvency or (2) whether House received reasonably equivalent value in exchange for the challenged transfers. Before we consider whether the omissions are subject to the doctrine of implied findings, we must interpret the statement of decision and decide whether it addressed the constructive fraud theory and, therefore, implied findings are not needed. In other words, is the constructive fraud theory a "'matter[] as to which the record is silent.'" (*Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 564.) In particular, we consider whether the trial court's general failure-of-proof determination should be interpreted as resolving the constructive fraud theory in favor of defendants.

As background, we note the statement of decision expressly addressed an element of King's actual fraud theory—fraudulent intent. It stated that King had the burden of proving fraudulent intent and that he did not meet his burden of proof. It reiterated this determination by stating "there is no proof by a preponderance of the evidence that any of the transfers were intended to fraudulently deprive King of judgment proceeds." Both of these statements are limited to fraudulent intent and cannot be interpreted as reaching the two factual elements for constructive fraud.

In comparison to these specific determinations, the statement of decision's disposition includes a general statement that King "has failed to establish his case on all three causes of action and theories by a preponderance of the evidence." The statement of decision and the remainder of the record is silent about the scope of this general failure-of-proof determination. Applying the presumption of correctness and related principles, we interpret the determination as resolving all of King's theories, including

13.

the constructive fraud theory. In other words, we do not interpret the opinion as erroneously ignoring a theory for relief raised by King.

Based on the interpretation King's constructive fraud theory was addressed by the court's general statement that King had not established his causes of action and theories by a preponderance of the evidence, we do not examine whether the constructive fraud theory could be resolved by implied findings of fact.[5] In other words, the explicit statement about the failure of proof is the basis for the trial court's decision on the constructive fraud theory and, therefore, there is no gap that needs to be filled with implied findings of fact.

To summarize, we conclude (1) the trial court determined King failed to prove his constructive fraud theory and (2) that determination is subject to review under the finding-compelled-as-a-matter-of-law standard of appellate review.

## II. Credibility Issues

### A. Explicit Findings Are Not Required

King contends "the lower court never even reached the issue of credibility of witnesses. This was manifest error." We disagree.

The lack of explicit credibility determinations is resolved by the doctrine of implied findings. (See *Martinez v. BaronHR, Inc.* (2020) 51 Cal.App.5th 962, 966 [implied credibility findings accepted by appellate court].) Accordingly, we infer the trial court considered the issue of witness credibility and made credibility findings in support of its judgment. King's argument the trial court never reached the issue of witness credibility is unconvincing because it ignores the long-established doctrine of implied findings and cites no authority supporting the contention such findings must be explicit.

---

[5]In such an examination, only implied findings *supported by substantial evidence* are adopted by the appellate court. (See *Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970 [under doctrine of implied findings, appellate court presumes trial court made all necessary findings supported by substantial evidence].)

14.

**B.     The Implied Credibility Findings Are Not Erroneous**

Appellate courts "generally defer to [a trial court's] credibility determinations." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 49.)  When a trial court finds a witness is credible, the appellate court must accept this credibility finding unless the testimony is incredible on its face, inherently improbable, or wholly unacceptable to reasonable minds.  (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786.)  Here, King has not established the testimony of House or May-Wesely falls within this narrow exception.  His arguments, which did not acknowledge the applicable standard, ask this court to reweigh the factors relevant to witness credibility and reach a determination contrary to the trial court's implied credibility findings.  We will not reweigh the evidence.  Our inquiry ends with the determination defendants' testimony was not incredible on its face, inherently improbable, or wholly unacceptable to reasonable minds.  Accordingly, we will defer to the trial court's credibility findings and those findings provide part of the foundation for our analysis of the facts.

**III.    Actual Fraud**

King asserts he proved the transfers were voidable under section 3439.04, the actual fraud provision.  He contends "[v]ast circumstantial evidence demonstrates that the transfer of $170,000.00 in cash from House to [May-]Wesely in the summer of 2016 and the transfer of the [Pollination Inc.] shares and [Pollination Inc.] cash flows were intentionally fraudulent and thus voidable under … § 3439.04."

The circumstantial evidence described in King's appellate brief is contradicted by House's direct testimony about his state of mind.  During the trial, House was asked whether he engaged in any of the transactions addressed in the questions posed by King's counsel with the intention of defrauding or hindering King as a creditor.  House answered:  "No."  The trial court found this testimony credible and concluded King failed to prove actual fraudulent intent.

15.

To establish the trial court erred in determining King failed to prove fraudulent intent, we apply the finding-compelled-as-a-matter-of-law standard. Under this standard, King must show his evidence was (1) uncontradicted and unimpeached and (2) of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding. (See *Dreyer's Grand Ice Cream, Inc. v. County of Kern*, *supra*, 218 Cal.App.4th at p. 838.) Here, the circumstantial evidence relied upon by King was contradicted by House's testimony. Therefore, a finding of fraudulent intent was not compelled as a matter of law.

King's failure to prove fraudulent intent supports the trial court's conclusion King did not prove his cause of action based on section 3439.04. It also supports the trial court conclusion King failed to prove his causes of action alleging (1) a conspiracy to defraud creditors and (2) aiding and abetting a fraud on creditors. As a result, we need not discuss those causes of action in detail or King's argument the good-faith-transferee defense is unavailable to May-Wesely as a matter of law.

## IV. Constructive Fraud

### A. Insolvency

Our analysis of King's constructive fraud claims begins with whether House "was insolvent at th[e] time" the transfers were made. (§ 3439.05, subd. (a).) The parties' written stipulation addressed House's insolvency by stating the judgment against him was valid and enforceable at all relevant times, and the unsatisfied amount of that judgment was in excess of the total value of House's assets at all relevant times. Based on these stipulated facts, the trial court was compelled as a matter of law to find King proved the insolvency element of his constructive fraud theory. (See § 3439.02 [definition of insolvent].)

Therefore, we conclude House was insolvent (1) when he surrendered his shares in Pollination Inc. in April 2015 and (2) when he deposited $170,000 into May-Wesely's

16.

bank account in July 2016. As a result, the existence of reversible error depends on the remaining element of the constructive fraud theory and whether the trial court was compelled as a matter of law to find House did not receive "reasonably equivalent value" for the two transfers. (§ 3439.05, subd. (a).)

**B. $170,000**

Under the definition of value in section 3439.03, value is given for a transfer if, in exchange, property is transferred to the debtor. The trial court found "that House and [May-]Wesely each contributed $170,000.00 for the purchase of real property as a newly married couple." Accordingly, we consider what House received in exchange for his transfer of $170,000. First, House was granted a 2 percent ownership interest in the Geer Road property. Second, under the agreement he and May-Wesely made, House received May-Wesely's promise to pay the cost of repairs, taxes, future maintenance, and mortgage installments.

Based on applicable law and the evidence presented, the trial court was compelled to find that House did not receive reasonably equivalent value in exchange for his $170,000. The Geer Road property was purchased with a down payment of less than the $340,000 placed in escrow and a mortgage of $738,000, which had a balloon payment after five years. Two percent of an *unencumbered* property valued at $1,078,000 is $21,560. Therefore, the value of the 2 percent ownership interest of the *encumbered* property is well below the $170,000 transferred by House. May-Wesely's argument that she transferred equivalent value in the form of $170,000 of her separate property is irrelevant to the application of the constructive fraud test, which compares what the debtor transferred and what the debtor received in exchange.

May-Wesely's promise to pay various costs and expenses related to the property does not constitute "value" under the statutory definition, which excludes "an unperformed promise made otherwise than in the ordinary course of the promisor's

17.

business to furnish support to the debtor." (§ 3439.03.)  Pursuant to this exclusion, the value of May-Wesely's promise to pay all of the future expenses arising in connection with the Geer Road property cannot be considered in evaluating whether House received a reasonable equivalent for his $170,000.  In *In re Carbaat* (N.D.Cal. 2006) 357 B.R. 553, the bankruptcy court stated that the definition of value in the bankruptcy statutes and section "3439.03 excludes an unperformed promise to provide future support to the debtor or to another person." (*In re Carbaat*, *supra*, at p. 561.)  The court stated:  "The rationale behind the statutory exclusion is that an unperformed promise to provide future support to the debtor does not benefit creditors in a liquidation." (*Ibid*.)  Therefore, defendants' reliance on May-Wesely's agreeing to make various payments in the future is misplaced because such an agreement does not qualify as "value" received by House in exchange for his contribution.  (§ 3439.03.)

Consequently, House's transfer of $170,000 to May-Wesely satisfied the test for constructive fraud because (1) he was insolvent at the time and (2) he did not receive reasonably equivalent value in exchange.  As a result, the trial court was compelled to find the transfer was voidable pursuant to section 3439.05, subdivision (a).

## C.    Shares of Pollination Inc.

There are two separate transfers of shares in Pollination Inc.  The first occurred when House "surrendered his shares back to [Pollination Inc.] on April 1, 2015."  The second occurred a year later, when May-Wesely received all the shares of Pollination Inc. in exchange for her $50,000 promissory note.

### 1.    2015 Transfer

The trial court's finding that House "surrendered" his shares back to Pollination Inc. implies House received nothing from Pollination Inc. in exchange for his shares.  We accept this implication because House was questioned on the subject during trial, he did

18.

not identify any payment or property he received for his shares, and he testified that an amount labeled "owner contraction" is a financial record for a payment of rent.

Defendants argue King failed to prove the lack of reasonably equivalent value in exchange for the Pollination Inc. shares. They assert that, without evidence of the value of the shares, "there is no way to determine reasonably equivalent value in exchange for those shares." In defendants' view of the evidence, "the 'shares' have no value outside of the labor required to operate the corporation—the labor contributed by House and [May-]Wesely."

We reject defendants' view of the value of the shares. In 2014, Pollination Inc. had $300,000 in a bank account. In 2016, May-Wesely testified she paid $50,000 for all of the shares in Pollination Inc. Therefore, we are compelled to find the shares had some value when House surrendered them in 2015. In other words, the inability of King to prove the exact value of the business on April 1, 2015, when House surrendered the shares does not mean we must accept that receiving nothing in exchange was the reasonable equivalent of the share's value. Accordingly, we find as a matter of law that House surrendered his shares to the corporation without receiving a reasonably equivalent value in exchange. As a result, his 2015 transfer of the shares is voidable pursuant to section 3439.05, subdivision (a).

### 2. *2016 Transfer to May-Wesely*

The transfer of shares from Pollination Inc. to May-Wesely in April 2016 is outside the scope of the UVTA because the transferor, Pollination Inc., was not a debtor of King and King did not pursue the theory that Pollination Inc. was an alter ego of House. Furthermore, his theories of conspiracy to defraud and aiding and abetting fraud cannot be used to establish error because the trial court properly determined he failed to prove actual fraudulent intent.

Alternatively, even if the corporation's 2016 transfer of shares was within the scope of the UVTA, King has not demonstrated we are compelled as a matter of law to find May-Wesely did not give reasonably equivalent value in exchange for the shares. King suggests May-Wesely's promissory note for $50,000 does not constitute "value" under the statutory definition. We disagree. The statutory definition of value excludes "an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person." (§ 3439.03.) Even if the initial delivery of the promissory note is treated as an unperformed promise, that promise had been performed long before the trial when May-Wesely paid off the note in March 2017. Thus, the promise to pay for the shares was not "an unperformed promise" for purposes of section 3439.03.

### D. Remedy

Both the July 2016 transfer of $170,000 from House to May-Wesely and the April 2015 transfer of House's shares in Pollination Inc. to the corporation are voidable as to King pursuant to section 3439.05, subdivision (a). The remedies a creditor may obtain under the UVTA are addressed in section 3439.07. "In an action for relief against a transfer … under [the UVTA], a creditor, subject to the limitations in Section 3439.08, may obtain: [¶] (1) Avoidance of the transfer … to the extent necessary to satisfy the creditor's claim." (§ 3439.07, subd. (a).) Under this provision, King is entitled to a judgment declaring the two transfers void. However, because the trial court did not reach the question of how the limitations in section 3439.08 apply to the facts of this case, that issue and the other remedies available under section 3439.07, subdivision (a) must be determined by the trial court on remand. Accordingly, the matter will be remanded to the trial court to enter a judgment in favor of King that voids the transfers and provides other relief appropriate under the UVTA. (See §§ 3439.07, 3439.08.)

20.

## DISPOSITION

The judgment is reversed. The trial court is directed to enter a judgment in favor of King (1) voiding the July 2016 transfer of $170,000 from House to May-Wesely and the April 2015 transfer of House's shares in Pollination Inc. to the corporation and (2) providing other relief in accordance with sections 3439.07 and 3439.08 and this opinion. Whether the trial court conducts further proceedings addressing other appropriate relief is, in the first instance, committed to the court's discretion. King shall recover his costs on appeal.

PEÑA, Acting P. J.

WE CONCUR:


MEEHAN, J.


DE SANTOS, J.

21.